**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
SANDRA RAGSDALE                    )
                                   )
                Plaintiff,         )
                                   )
           v.                      )     Civil Action No. 07-1256(RBW)
                                   )
ALBERTO GONZALES                   )
U.S. Department of Justice,        )
                                   )
                Defendant.         )
                                   )
_____  )
```

**DEFENDANT'S MOTION TO DISMISS THE**
**COMPLAINT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendant Alberto Gonzales,[1] in his official capacity as Attorney General, respectfully requests that this Court dismiss plaintiff's complaint for failure to state a claim. In the alternative, defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds there are no genuine issues of fact and the defendant is entitled to judgment as a matter of law.

In support of this motion, defendant respectfully refers the Court to the memorandum in support of this motion, a statement of material facts as to which there is no genuine issue and exhibits.

---

[1] Attorney General Gonzales has resigned and, pursuant to Fed. R. Civ. P. 25(d), his successor shall be automatically substituted in his place.

Respectfully submitted,

__/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


__/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


__/s/_____
DIANE M. SULLIVAN, D. C. BAR # 12765
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-7205

Of Counsel:
JON A. MELLIS
Assistant General Counsel
Federal Bureau of Investigation

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SANDRA RAGSDALE                    )
                                   )
              Plaintiff,           )
                                   )
         v.                        )     Civil Action No. 07-1256(RBW)
                                   )
ALBERTO GONZALES                   )
U.S. Department of Justice,        )
                                   )
              Defendant.           )
                                   )
_____)

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**Introduction**

Plaintiff filed suit under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. (Complaint, ¶ 1) alleging she was denied the use of annual leave and placed on leave without pay (LWOP) because of her disability status and that she was "harassed due to her disability status and treated differently than similarly situated non-disabled employees." (Complaint, ¶ 15). Plaintiff fails to state a claim under the ADA because she is a federal employee and the ADA does not apply to the federal government. 42 U.S.C. § 12111(s)(B)(i). Rather, as a federal employee she must bring an action under the Rehabilitation Act of 1993, 29 U.S.C. § 791 et seq. Accordingly, plaintiff's claim under the ADA must be dismissed. Alternatively, even if plaintiff had sued under the Rehabilitation Act, the undisputed facts demonstrate that the defendant is entitled to judgment as a matter of law.

**FACTS**

Plaintiff is employed as a GS-12 Personnel Security Specialist, Security Reinvestigations Unit, Personnel Security Section ("PSS"), Security Division, of the Federal Bureau of Investigation ("FBI"). Plaintiff entered on duty with the FBI on August 7, 1973 (Exhibit 1). Due to her longevity as a federal employee, plaintiff accrues annual leave ("AL") at a rate of eight hours per pay period. She also accrues sick leave ("SL") at a rate of four hours per pay period. Id.

During the relevant period of her complaint, plaintiff was assigned to the FBI's PSS, Clearance Passage and Access Unit ("CPAU"). Plaintiff's supervisors included Section Chief ("SC") Sharon Durkin, Unit Chief ("UC") Wyelene Haase and Supervisory Personnel Security Specialist ("SPSS") Winifred Huger. Id. SC Durkin, plaintiff's third line supervisor, became aware of plaintiff's excessive use of leave during the summer of 2004 when plaintiff submitted a request for advance SL in anticipation of an upcoming surgical procedure. In reviewing this request, SC Durkin learned from plaintiff's previous Unit Chief, Roger Pendenza, that plaintiff had a history of excessive absenteeism and had exhausted all of her SL and AL. This review also revealed that plaintiff frequently carried negative leave balances (Exhibit 2 at 2; see also Exhibit 11).

SC Durkin then discussed plaintiff's request for advance SL

2

with FBI Deputy Assistant Director (DAD) Jeffrey Berkin of the
Security Division.  Mr. Berkin reviewed plaintiff's time and
attendance records and denied her request.  He advised SC Durkin
that plaintiff would be required to be placed on Leave Without
Pay (LWOP) if she had no available leave to take (Exhibit 2 at
3).  DAD Berkin also advised SC Durkin that she needed to monitor
those employees in her section who were demonstrating a pattern
of excessive use of leave, as had been the case with plaintiff,
since it was effecting the efficiency of the division. Id.  After
her discussion with DAD Berkin, SC Durkin advised the UC's under
her chain of command that it would be her practice in the future
not to approve advance AL or SL.  SC Durkin believed this was
necessary to curb what had become a systemic problem. Id.

    During the November 2004-March 2005 time period, UC Haase
advised SC Durkin that plaintiff continued her practice of
absenteeism, including the use of LWOP. Id.  Plaintiff would
typically call her unit and leave a voice message early in the
morning, usually between 3:00 am and 4:00 am, prior to the
arrival of any unit members, indicating that she would not be
coming to work that day (Exhibit 3).  Plaintiff generally carried
a negative SL balance and a zero AL balance.  Consequently,
plaintiff would request that she be placed on LWOP. Id.

    In November 2004, UC Haase contacted the FBI's Performance,
Recognition and Awards Unit ("PRAU") seeking guidance on how to

3

address plaintiff's frequent absences from work and the impact it
was having on plaintiff's productivity and the overall efficiency
of the unit (Id.; see also Exhibit 4).  For example, on November
23, 2004, plaintiff had a negative balance in both AL and SL.
Moreover, she was not earning any leave in that pay period
because she had accrued 80 hours of LWOP during that same pay
period. Id.  On March 2, 2005, when plaintiff requested advance
annual leave, UC Haase brought it to the attention of SC Durkin.
SC Durkin, consistent with her policy for the entire PSS, would
not approve advance annual leave for any employee (Exhibit 3  at
5-6).

     On March 3, 2005, UC Haase and SPSS Huger met with plaintiff
to counsel her about excessive absenteeism and to advise her that
her excessive use of leave, including LWOP, could not continue.
Plaintiff was advised that she should seek advice from other FBI
entities to determine what options were available to her to
address her leave situation.  Specifically, plaintiff was
informed that she should contact the Employee Assistance Program,
Voluntary Leave Transfer Program, Employee Benefits Unit, or the
Reasonable Accommodation Committee of the FBI's Office of Equal
Employment Opportunity Affairs, and to explore the criteria for
invoking the Family Medical Leave Act (Id. at 4).

     After demonstrating some improvement, on May 23, 2005,
plaintiff called her office requesting that she would be on LWOP

for the period May 23-25, 2005.  At the time, plaintiff had a negative SL balance and a zero AL balance (Exhibit 5).  On May 26 and 27, 2005, plaintiff attended a training class. <u>Id</u>.  Pay period ("PP") 12 for calendar year 2005 ran from May 15-28, 2005. At the beginning of PP 12, plaintiff's AL balance was 0 hours and her SL balance was -40.50 hours.  Plaintiff accrued 8 AL hours and 4 SL hours during PP 12, and used 8 AL hours during the period.  Payroll Statement of Earnings, PP 12, 2005 (Exhibit 6). PP 13 for calendar year 2005 ran from May 29-June 11, 2005.  At the beginning of PP 13, plaintiff's AL balance was 0 hours and her SL balance was -36.50 hours.  Plaintiff accrued 8 AL hours and 4 SL hours during PP 13, leaving her with a balance of 8 AL hours and -32.50 SL hours at the end of the pay period.  Payroll Statement of Earnings, PP 13, 2005 (Exhibit 7).

On May 31, 2005, plaintiff telephoned her office and left a message indicating that she would be on LWOP status for that day (Exhibit 5 at 3).  Plaintiff returned to work on June 1, 2005, and advised her first line supervisor, SPSS Huger, that she wanted to change her LWOP status on May 31, 2005, to AL. <u>Id</u>.  In reviewing plaintiff's request to use AL for her May 31, 2005, absence, SPSS Huger confirmed with Selina Jameson, Time and Attendance record-keeper for the unit, that plaintiff had an AL balance of 0 at the beginning of PP 13.  UC Haase, advised Ms. Huger that she would not approve plaintiff's request for advance

5

AL (Id. at 4).

The FBI's leave policy is that an employee does not accrue leave for a pay period until the end of the pay period (Exhibit 4 at 4; Exhibit 8). The advancement of AL or SL is not an entitlement of an employee and it is within a supervisor's discretion whether or not approving an employee's request for advanced leave is in the best business interest of the FBI. Id. The FBI's Leave Policy Manual states that AL "will accrue to an employee during each full biweekly pay period while in a pay status or in a combination of pay and nonpay status." (Exhibit 8). The Manual states, in pertinent part, that leave "does not accrue for partial pay periods at the beginning or end of employment." Id. An employee must successfully complete a full pay period in order to accrue leave during that pay period (Exhibit 4 at 4). OPM policy also indicates that employees do not have an entitlement to advance annual leave. OPM Leave Policy Manual (Exhibit 12).

**ARGUMENT**

### 1.   **Plaintiff's Claim under the ADA Should Be Dismissed**.

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint and dismissal is appropriate where the "plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Browning v. Clinton, 292 F.3d 235, 241 (D.C. Cir. 2002) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

The Court is to treat the complaint's factual allegations as true, see Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993), and must grant plaintiff "the benefit of all inferences that can be derived from the facts alleged," Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir.1979). However, "the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by the facts alleged in the complaint, nor must the Court accept the plaintiff's legal conclusions." Akintomide v. United States, 2000 WL 1693739, at *1 (D.D.C. Oct. 31, 2000) citing National Treasury Employees Union v. United States, 101 F.3d 1423, 1430 (D.C. Cir. 1996) and Kowal v. MCI Communication Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

The plaintiff is an employee of the Federal Bureau of Investigation (FBI)(Exhibit 1). The FBI is an agency of the federal government. Plaintiff alleges that she was discriminated against because of her disability. The ADA does not apply to the federal government. 42 U.S.C. § 12111(5)(B)(i). Rather, a federal employee must sue under the Rehabilitation Act, 29 U.S.C. § 791 et seq. See Rivera v. Heyman, 157 F.d 101, 103 (2nd Cir. 1998); Harrison v. Rubin, 174 F.3d 249, 253 (D.C. Cir. 1999).

Thus, from the facts alleged in the Complaint, plaintiff can prove no set of facts that would entitle her to relief under the ADA.

## II.    Summary Judgment Standard

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Tao v. Freeh, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Plaintiff, in response to defendant's motion, must "go beyond the pleadings and by [their] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial."  Id. at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  To be material, the factual assertion must

8

be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. Laningham v. U.S. Navy, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); Liberty Lobby, 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." Williams v. Callaghan, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached

9

with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." Morgan v. Fed. Home Loan Mortgage Corp., 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting Calhoun v. Johnson, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), aff'd, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); see also Marshall v. James, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases). "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." Marshall, 276 F. Supp. 2d at 47 (quoting Celotex Corp., 477 U.S. at 327).

### III. **Plaintiff Cannot Sustain Her Burden of Proof under the Rehabilitation Act**.

Even assuming that plaintiff seeks to amend her complaint to allege a complaint under the Rehabilitation Act, 29 U.S.C. § 794, plaintiff cannot sustain her burden of proof. See Harrison v. Rubin, 174 F.3d at 253 (D.C. Cir. 1999)(motion to amend complaint to substitute the Rehabilitation Act appropriate when there is no prejudice shown).

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability" may be discriminated

against by a federal agency or recipient of federal funds "solely by reason of her or his disability."[2] 29 U.S.C. § 794(a). This language requires plaintiff to establish a "causal link . . .[that] the employer . . . acted with an awareness of the disability itself." Brown v. Small, 2005 WL 736530 (D.D.C. 2005) quoting Crandall v. Paralyzed Veterans of America, 164 F.3d 894, 897 (D.C. Cir. 1998). EEOC regulations interpreting Section 501 require agencies to make reasonable accommodations for persons with a disability unless such accommodations would impose an undue hardship on the agency. 29 C.F.R. § 1614.203(c). Because of the similarity between the Americans with Disabilities Act of 1990 and the Rehabilitation Act, "cases interpreting either are applicable and interchangeable." 29 U.S.C. § 794(d) ("[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under [certain provisions of] the Americans with Disabilities Act."); Scarborough v. Natsios, 190 F. Supp 2d 5 (D.D.C. 2002), citing Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir.1998); accord, Bugg-Barber v. Randstad US L.P., 271 F.Supp.2d 120, 127 (D.D.C. 2003). In order to prove a violation of the ADA, the alleged

---

[2] The ADA bars discrimination against a "qualified individual with a disability ... in regard to ... the ... discharge of employees ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

discrimination must occur in regard to some adverse "personnel decision or other term or condition of employment." Marshall v. Federal Express Corp., 130 F.3d 1095, 1099 (D.C. Cir. 1997).

The Rehabilitation Act defines an "individual with a disability" as "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(8)(B); see also 29 U.S.C. § 794(a). In turn, a disability is "a physical or mental impairment that substantially limits one or more of the major life activities."[3] 29 U.S.C. § 705(9)(B).

The Rehabilitation Act not only requires an individual to be disabled, but also requires him or her to be "qualified" for the employment position at issue. A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8); see 29 C.F.R. § 1614.203(a)(6) (EEOC

---

[3] The words "disability" and "handicap" are used interchangeably in this brief. See Randon v. Abbott, 524 U.S. 624, 631 (1998) ("The ADA's definition of disability is drawn almost verbatim from the definition of 'handicapped individual' included in the Rehabilitation Act....").

Rehabilitation Act regulation).[4]  Accordingly, an individual with a disability is "qualified" if he or she can perform the essential functions of the position with a reasonable accommodation. <u>Carr v. Reno</u>, 23 F.3d 525, 529 (D.C. Cir. 1994).[5]

In sum, to allege a truly disabling condition for purposes of claims similar to those raised here, a plaintiff must prove, by a preponderance of the evidence, that she has a permanent or long-term impairment which substantially limits a major life activity, but that with a reasonable accommodation (which she must demonstrate exists), she can perform the essential functions of her job.  <u>See</u> <u>Aka v. Washington Hospital Center</u>, 156 F.3d 1284 (D.C. Cir. 1998); <u>Flemmings v. Howard University</u>, 198 F.3d 857, 861 (D.C. Cir. 1999); <u>Paegle v. Dep't of the Interior</u>, 813 F.Supp. 61, 64 (D.D.C. 1993) ("The [Rehabilitation] Act identifies a handicap as a severe disability of a permanent nature); <u>Pugh v. J.C. Penny Co., Inc.</u>, Civ.A.No. 97-3846, 1996 WL 263219, *6 (E.D.La. May 15, 1996);  <u>Dorchy v. Washington</u>

---

[4] The ADA defines the term "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A); <u>see</u> 29 C.F.R. § 1614.203(c)(1).

[5] The ADA further defines the term "reasonable accommodation" to include "job restructuring [and] part-time or modified work schedules." 42 U.S.C. § 12111(9); <u>see</u> 29 C.F.R. § 1614.203(c)(2).

Metropolitan Area Transit Authority, 45 F.Supp. 2d 5, 11 and 13 (D.D.C. 1999) (Employee has the burden of proving that she can perform the essential functions of her job and proffering a reasonable accommodation that will allow her to perform these functions.); Feliciano v. Rhode Island, 160 F.3d 780 (1st Cir. 1998) (Plaintiff bears the burden of showing the existence of a reasonable accommodation).

   A.    **Complainant Cannot Establish a Prima Facie Case of Disability Discrimination**.

   Plaintiff alleges in Count I that her supervisor's denial of her request to use annual leave ("AL") on May 31, 2005[6] and to categorize her absence from work on that date as Leave Without Pay ("LWOP") was the result of the FBI's discrimination against her on the basis of a  claimed disability.

   In analyzing a disparate treatment claim under the Rehabilitation Act, where the agency denies that its decisions were motivated by complainant's disability and there is no direct evidence of discrimination, courts have applied the same McDonnell Douglas analysis as used in Title VII cases. See Swanks v. WMATA, 179 F.3d 929, 933-34 (D.C. Cir. 1999); Heyman v. Queens Village Committee for Health for Jamaica Community Adolescent

---

   [6] The Complaint fails to specify a date of the alleged action; however, based on the Report of Investigation (ROI) prepared during the course of the administrative EEOC investigation, the plaintiff alleges that the denial of her request to use annual leave on May 31, 2005, was discriminatory.

_Program_, 198 F.3d 68 (2d Cir. 1999); _Smith v. Barton_, 914 F.2d 1330, 1339 (9th Cir. 1990).  To establish a claim of disability discrimination, plaintiff has the burden of establishing: (1) that she suffers from a disability as defined in 29 C.F.R. § 1614.203 (a), (b); (2) that she is an otherwise qualified individual with a disability; (3) that the employer was aware of her disability; and (4) she was denied a reasonable accommodation for her disability.  _Scarborough v. Natsios_, 190 F.Supp 2d 5, 19 (D.D.C. 2002); _Castle v. Bentsen_, 867 F.Supp. 1, 2 (D.D.C. 1994). The language "solely by reason of" in the statute requires plaintiff to establish a "causal link...[that] the employer...acted with an awareness of the disability itself." _See_ 29 U.S.C. § 794 (a); _Brown v. Small_, 2005 WL 736530*5 (D.D.C.), _Crandall v. Paralyzed Veterans of America_, 146 F.3d 894, 897 (D.C.Cir. 1998).

### A.  **Plaintiff did not suffer adverse Consequences**

The standards for determining a violation are the same as those applied under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 _et seq_.  _See_ 29 U.S.C. § 794 (d).  In order to prove a violation of the ADA, the alleged discrimination "must occur in regard to some adverse personnel decision or other term or condition of employment."  _Marshall v. Federal Express Corp.,_ 130 F.3d 1095, 1099 (D.C.Cir. 1997).  An adverse employment action is one that resulted in a "diminution in pay or benefits

15

[or] 'some other materially adverse consequences affecting the terms, conditions, or privileges of her employment...such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm.'' Bailey v. Henderson, 94 F.Supp.2d 68, 72 (D.D.C. 2000), quoting Brown v. Brody, 199 F.3d 446, 457 (D.C.Cir. 1999); see also Currier v. Postmaster, 304 F.3d 87, 89 (D.C.Cir. 2002) ("[T]he employee must be worse off after the personnel action than before it; otherwise, he has suffered no objectively tangible harm"); Brodetski v. Duffey, 141 F.Supp.2d 35, 42-47 (D.D.C. 2001) (finding no adverse employment actions from, inter alia, decisions denying an employee's requests for administrative leave and alterations to work schedule).

**B.  Plaintiff was not a qualified individual under the ADA**

Plaintiff's assertion that the FBI discriminated against her because of her disability when her request for AL on May 31, 2005, was denied and she was forced to have her absence charged as LWOP must fail because she cannot demonstrate that she is a "qualified individual with a disability," or that she suffered an adverse action.  Under the facts of this case, it cannot be said that a reasonable trier of fact could conclude that plaintiff suffered any objectively tangible harm.  Quite simply, on the day that plaintiff requested AL, she had no AL available and had a negative SL balance (Exhibit 5; Exhibit 7).  In order to properly

16

account for her absence, the defendant categorized plaintiff's absence as LWOP (Exhibit 4 at 4; Exhibit 8). Since the denial of plaintiff's request for AL on May 31, 2005, was not a denial of a benefit or privilege which plaintiff had accrued at the time of her request, it cannot be said that plaintiff was "worse off after the personnel action than before it" and thus, she "suffered no objectively tangible harm." Currier, 304 F.3d at 89.

The undisputed facts demonstrate that plaintiff's supervisors never denied any of her requests for leave. Even though her SL balance was negative and her AL balance consistently hovered around zero, plaintiff was routinely placed on LWOP when she was absent, rather than AWOL which could incur disciplinary and punitive consequences (Exhibit 13). Plaintiff cannot prove that she suffered an adverse action.

Plaintiff cannot establish that she was disabled within the meaning of the statute. The Rehabilitation Act defines a disability as a "physical or mental impairment that substantially limits one or more major life activities." 29 U.S.C. § 705 (9) (B). "Major life activities" are defined by regulation as "functions, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2 (i). The Act's terms are "interpreted strictly to create a demanding standard for

17

qualifying as disabled." <u>Toyota Motor Manufacturing Kentucky, Inc. v. Williams</u>, 534 U.S. 184, 197 (2002). In analyzing the issue, the Court must "ask whether [plaintiff's] impairments prevented or restricted her from performing tasks that are of central importance to most people's daily lives." <u>Id</u>. at 187.

Plaintiff does not claim that she was substantially limited in working. Rather, plaintiff concedes that "[w]hen I am able to come to work, I have no problem performing my job. I received exceptional performance ratings, meet expectations ratings, time off awards, and monetary awards. I am a dedicated, hardworking and productive employee." (Exhibit 1 at 3). The plaintiff asserts, however, that she has a 30% disability in one knee and a 40% disability in the other, resulting in "chronic pain and difficulty walking" and necessitating her use of a cane to assist in walking. The basis of this disability, according to plaintiff, is a fall that she had at FBI Headquarters in 1986 and which required surgery on both knees (<u>Id</u>.). Moreover, plaintiff lists the following medical conditions as contributing to her "disability": asthma, systemic lupus erythematosus, hiatal hernia, gastroesophageal reflux disease, arthritis, bilateral patellar chrondromalacia, irritable bowel syndrome, multiple chronic allergies and fibromyalgia, as well as fatigue, resulting from her lupus condition. <u>Id</u>.

However, the medical documentation provided by plaintiff

18

fails to establish that she suffers from a physical or mental impairment that substantially limits a major life activity (See Exhibit 11).  There is absolutely no medical documentation to substantiate her claim that she is disabled within the meaning of the statute or what reasonable accomodation is required for her alleged disabilities. Id.  The only indication in plaintiff's medical record suggesting that plaintiff alerted the FBI to a lupus condition is a generic informational brochure about the condition, devoid of any particularized diagnosis or symptoms relevant to plaintiff and only a few documents indicating that plaintiff was seen by a treating physician for lupus.  The record is devoid of specific information about the effects of the condition on plaintiff's major life activities (Exhibit 11). Moreover, plaintiff cannot demonstrate that her employer "regarded" her as having such a condition.  29 C.F.R. § 1614.203 (a) (1).  Plaintiff fails to show that her employer perceived her condition as substantially limiting a major life activity, rather than their knowledge of a medical condition.  An employer's knowledge of an employee's condition without more is insufficient to establish a "regarded as" claim.  Kellogg v. Union Pac. R.R. Co., 233 F.3d 1083, 1089 (8th Cir. 2000).

Plaintiff's own account of her conversation with her supervisors regarding her recurring absenteeism clearly indicates that management did not regard her as disabled within the meaning

19

of the statute (Exhibit 3).  According to plaintiff, Ms. Haase informed her that she "must come to work and cannot call in during inclement weather (snow/ice) because other people are coming in to work" and "further stated that she doesn't understand why I can't come to work on ice despite reading her unit folder." (Exhibit 1).  Id.  Although plaintiff uses a cane, the record is devoid of any evidence that plaintiff's supervisors regarded her as a qualified disabled individual.  Moreover, each medical document contained in her unit medical record that returned plaintiff to work did so without restriction and in "full duty" status (Exhibit 11).

### C.    **Plaintiff Cannot Show That She Was Not Reasonably Accommodated**.

Finally, even assuming that plaintiff could establish she is physically disabled under the statute, she still fails a prima facie showing because she cannot demonstrate that the FBI failed to reasonably accommodate her.  "An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." Flemmings v. Howard University, 198 F.3d 857, 861 (D.C.Cir. 1999).  Here, the record clearly demonstrates that the FBI has routinely provided reasonable accommodation to allow plaintiff to address any medical issues that she has experienced. From January 23, 2005 to August 6, 2005, plaintiff was granted 176.25 hours of LWOP (as well as 88 hours of AL) (Exhibit 9).

During this period plaintiff carried a negative SL balance and was charged LWOP for absences that occurred when she did not have any available AL (Exhibit 2; Exhibit 3).  The FBI's practice of allowing plaintiff LWOP when she had no available AL or SL to attend medical appointments or otherwise address any medical issues, is specifically recognized by the Equal Employment Opportunity Commission as a means of providing an employee with a reasonable accommodation (Exhibit 10).

Significantly, plaintiff has never requested a reasonable accommodation from the FBI's Office of Equal Employment Opportunity Affairs, which provides a readily available process for employees seeking a reasonable accommodation (Exhibit 10).[7] She has, therefore, failed to create a genuine issue of material fact with respect to the FBI's otherwise appropriate responses to her frequent, if not excessive absences.

### D.    **Plaintiff Fails to Sustain Her Claim of Disparate Treatment**.

Plaintiff also asserts that she was treated differently than "similarly situated non-disabled employees" (Compl., ¶ 15).  In this context, plaintiff must show that she was treated differently than similarly situated employees who are not disabled.  Carroll v. England, 321 F.Supp. 2d 58, 69 (D.D.C. 2004); Brown, 199 F.3d at 452; Swanks, 179 F.3d at 932; see also

---

[7] It is not apparent from the complaint what, if any other, accommodations she required for her claimed physical limitations.

Neurin v. Addici, Mastriani, Meeks & Schill, 43 F.3d 1507 (D.C. Cir. 1995). Here, plaintiff cannot demonstrate that any other similarly-situated "non-disabled" employee received more favorable treatment than her. Plaintiff's supervisors had never approved advance AL for an employee who had a balance of 0 hours at the time of the request (Exhibits 2, 3, 4). The denial of plaintiff's request was consistent with a universally applied policy within the Security Division that requests for advance AL would not be approved; in fact, advance AL for an employee who had no leave balance to use had never been authorized by SC Durkin, the management official ultimately responsible for the decision concerning plaintiff's request (Exhibit 2 at 2-5). Since plaintiff can produce no evidence of other employees in her Section who requested, and were denied, AL while carrying an available balance of 0 hours, her claim must fail, as no relevant comparators exist. Dorchy v. Washington Metropolitan Area Transit Authority, 45 F.Supp.2d 5, 17 (D.D.C. 1999), quoting Pierce v. Commonwealth Life Ins., Co., 40 F.3d 796, 802 (D.C.Cir. 1987).

Plaintiff has failed to demonstrate that she was treated differently than other similarly situated employees or to produce any other evidence that would permit an inference of discriminatory intent. Stella v. Mineta, 284 F.3d 135, 144-145 (D.C. Cir. 2002), citing Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999). Thus, plaintiff cannot establish a claim under the

Rehabilitation Act.

### IV.  Plaintiff's Complaint Fails to State a Hostile Work Environment Claim Based on Disability Discrimination.

In Count II, plaintiff alleges a hostile work environment claim based upon disability discrimination.  Although the complaint is ambiguous and vague, plaintiff seemingly alleges that the denial of her request to use AL on May 31, 2005, and the meeting with her supervisors on March 3, 2005, during which they counseled her on her excessive use of leave, constitute harassment and created a hostile work environment for her based on her disability.

Hostile work environment claims are fundamentally different from claims challenging discrete adverse personnel actions, in that they involve repeated discriminatory intimidation, ridicule, and insult in the workplace.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115-16 (2002).  To prevail on such a hostile work environment claim, a plaintiff must show that the employer subjected her to "discriminatory intimidation, ridicule, and insult of such 'severity or pervasiveness [as] to alter the conditions of [her] employment and create an abusive working environment.'"  Hussain v. Nicholson, 435 F.3d at 366 (quoting Harris v. Forklift Sys., 10 U.S. at 21-22).  A workplace environment becomes "hostile" only when the offensive conduct "permeate[s] [the workplace] with discriminatory intimidation,

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Oncale v. Sundowner Offshore Servs., Inc,, 523 U.S. 75, 81 (1998); accord Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); see also Pa. State Police v. Suders,542 U.S. 129 (2004); Clark Cty. School Dist., 532 U.S. at 270-271; Holbrook v. Reno, 196 F.3d at 262.

The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct constitutes an actionable hostile work environment. To determine whether a work environment is sufficiently hostile to be actionable, a court should consider: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct reasonably interferes with the employees performance. See Faragher v. Boca Raton, 524 U.S. 775, 787-88 (1998). Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status. Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002). Thus "to sustain a hostile work environment claim . . . [plaintiff] must produce evidence that she was discriminated against because of her [status]." Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 440 (2d Cir. 1999) (claim for hostile work environment failed where only three of fifteen

alleged incidents had racial overtones); <u>see</u> <u>also</u> <u>Hardin v. S.C.</u>
<u>Johnson & Son, Inc.</u>, 167 F.3d 340, 345-46 (7th Cir.1999) (hostile
work environment claim failed where insufficient evidence that
alleged harassing behavior was motivated by discrimination);
<u>Jones</u>, 12 F. Supp. 2d at 12 (hostile work environment claim
failed where plaintiff had "not demonstrated that any of the
conduct of which he complains was related to his race, or that
his workplace was permeated with racially discriminatory
behavior").

It is clear from the facts alleged, plaintiff can prove no
set of facts to support her hostile work environment claim.
<u>Morgan</u>, 536 U.S. at 115-16 (workplace must be permeated with
"discriminatory intimidation, ridicule, and insult").
Plaintiff's allegation that she was denied the use of AL on one
occasion fails to demonstrate the severity, pervasiveness, or
abusiveness necessary for a hostile work environment claim.
<u>Oncale</u>, 523 U.S. at 1; <u>Holbrook</u>, 196 F.3d at 262.  Plaintiff also
complains that her work performance was criticized during a March
3, 2005 meeting and that she was counseled regarding her
excessive absenteeism.  Quite simply, this is "the ordinary
tribulation[s] of the workplace" that is repeatedly held not to
create a hostile work environment.  <u>Faragher</u>, 524 U.S. at 787
<u>Brooks-Miller v. England</u>, No. Civ.02-0888 (RJL), 2004 WL 1874998
(D.D.C. Aug. 18, 2004).  <u>See</u> <u>also</u> <u>Singh v. U.S. House of</u>

<u>Representatives</u>, 300 F. Supp. 2d 48, 56 -57 (D.D.C. 2004)
(rejecting a hostile work environment claim based on supervisors
criticism of work).

In sum, plaintiff's allegations do not rise to the level of
the severe, pervasive, and abusive conduct required for a hostile
work environment claim and should be dismissed for failure to
state a claim.

### V. **<u>Plaintiff Cannot Demonstrate That the Articulated Non Discriminatory Reasons for Denying Her Annual Leave Were Pretext</u>**.

The FBI had a legitimate, nondiscriminatory reason for
denying plaintiff's request for AL on May 31, 2005. Quite
simply, plaintiff's request was denied because she had no
available AL to use. On May 31, 2005, at the commencement of the
applicable pay period (PP 13), plaintiff had a zero balance of
accrued AL. She was granted LWOP because she had no accrued AL.
This action was consistent with FBI policy and the manner in
which the leave policy has been universally applied (Exhibit 12).

Plaintiff's contention that she should have been credited at
the beginning of the pay period with the eight hours of AL that
she was to earn during the pay period is without merit.
Plaintiff argues that FBI's policy that AL is not earned until
the completion of the pay period is arbitrary. AL accrues at the
completion of the pay period in which it is earned. The accrual
of leave is a benefit of working. Once you work for the pay

period you receive the benefit, not before. The undisputed record reflects advance SL on AL would not be approved for any employee in the Security Division (Exhibit 2). Plaintiff fails to demonstrate that defendant's reasons were both false and motivated by impermissible discrimination. <u>Hicks</u>, 509 U.S. 502, 515.

Plaintiff has failed to demonstrate that the reasons articulated by defendant were pretext for discrimination.

**V.  <u>CONCLUSION</u>**

For the foregoing reasons, plaintiff's Complaint should be dismissed, or alternatively, summary judgment should be granted in favor of defendant.

Respectfully submitted,

__/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


__/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


__/s/_____
DIANE M. SULLIVAN, D. C. BAR # 12765
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-7205

Of Counsel:
JON A. MELLIS
Assistant General Counsel

27

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
SANDRA RAGSDALE                   )
                                  )
              Plaintiff,          )
                                  )
         v.                       )      Civil Action No. 07-1256(RBW)
                                  )
ALBERTO GONZALES                  )
U.S. Department of Justice,       )
                                  )
              Defendant.          )
                                  )
_____ )
```

## DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), defendant respectfully submits this statement of material facts not in dispute.

1.  Plaintiff is employed as a GS-12 Personnel Security Specialist, Security Reinvestigations Unit, Personnel Security Section ("PSS"), Security Division, of the Federal Bureau of Investigation ("FBI"). Plaintiff entered on duty with the FBI on August 7, 1973 (Exhibit 1).

2.  Plaintiff accrues annual leave ("AL") at a rate of eight hours per pay period. She also accrues sick leave ("SL") at a rate of four hours per pay period. Id.

3.  During the relevant period of her complaint, plaintiff was assigned to the FBI's PSS, Clearance Passage and Access Unit ("CPAU"). Plaintiff's supervisors included Section Chief ("SC") Sharon Durkin, Unit Chief ("UC") Wyelene Haase and Supervisory Personnel Security Specialist ("SPSS") Winifred Huger. Id.

4.  Ms. Durkin, plaintiff's third line supervisor, first became aware of plaintiff's excessive use of leave during the summer of 2004 when plaintiff submitted a request for advance SL, in anticipation of an upcoming surgical procedure.  In reviewing this request, Ms. Durkin learned from plaintiff's previous Unit Chief, Roger Pendenza, that plaintiff had a history of absenteeism and routinely exhausted all of her SL and AL.  The review also revealed that plaintiff often carried a negative balance in both leave categories (Exhibit 2; see also attached documents from plaintiff's unit medical records, Exhibit 11).

5.  SC Durkin discussed plaintiff's request for advance SL with Jeffrey Berkin, Deputy Assistant Director (DAD) of the Security Division.  Mr. Burkin, after reviewing plaintiff's time and attendance records, denied plaintiff's request for advanced SL.  He advised Ms. Durkin that plaintiff should be placed on Leave Without Pay (LWOP) status for her absences, when she had no available leave (Exhibit 2 at 3).

6.  DAD Berkin advised SC Durkin to monitor those employees in her section who were demonstrating a pattern of excessive use of leave, as had been the case with plaintiff.  DAD Berkin emphasized that the excessive use of leave was adversely effecting the efficiency of the Division.  Id.

7.  SC Durkin advised the Unit Chief's under her chain of command that it would be her practice in the future not to

2

approve advance AL or advance SL. Id.

8.   From November 2004 to March 2005, UC Haase, plaintiff's second line supervisor, advised SC Durkin that plaintiff was frequently absent, including periods on LWOP because she had no available AL or SL. Id.

9. During the period that UC Haase was assigned to the CPAU, plaintiff carried a negative balance for SL and usually a zero balance for AL (Exhibit 3).

10.   In November 2004, UC Haase contacted the FBI's Performance, Recognition and Awards Unit ("PRAU") seeking guidance as to how deal with plaintiff's frequent absences from work and the negative impact that the her absenteeism was having on her work productivity and overall efficiency of the unit. Id.

11.   PRAU advised UC Haase that she should counsel plaintiff about her absences and their impact on productivity (Exhibit 4).

12.   November 23, 2004, plaintiff had a negative balance in both AL and SL.  Moreover, she was not earning any leave because she had accrued 80 hours of LWOP during that same pay period. Id.

13.   On March 2, 2005, UC Haase discussed plaintiff's request for advance annual leave with SC Durkin.  SC Durkin informed UC Haase that, consistent with her policy for the entire Office, she would not approve advance annual leave for any employee (Exhibit 3  at 5-6).

14.   On March 3, 2005, UC Haase and SPSS Huger met with

3

plaintiff to discuss her absenteeism.  Ms. Haase advised

plaintiff that her excessive use of leave, to include LWOP, could

not continue.  Ms. Haase further advised plaintiff that she

should seek advice from other FBI entities to find out what

options were available so she could address her leave situation

(Exhibit 3).  Specifically, Ms. Haase informed plaintiff that she

could contact the Employee Assistance Program, Voluntary Leave

Transfer Program, Employee Benefits Unit, the Reasonable

Accommodation Committee of the FBI's Office of Equal Employment

Opportunity Affairs, and to explore the criteria for invoking the

Family Medical Leave Act (Id. at 4).

15.  After the March 3, 2005 meeting, Ms. Haase noticed an

improvement in plaintiff's attendance.  Id.

16.  On May 23, 2005, plaintiff called the office to

indicate that she would be on LWOP for the period May 23-25,

2005.  Plaintiff had a negative SL balance and a zero AL balance

(Exhibit 5).

17.  On May 26 and 27, 2005, plaintiff attended a training

class.  Id.

18.  Pay period ("PP") 12 for calendar year 2005 ran from

May 15-28, 2005.  At the beginning of PP 12, plaintiff's AL

balance was 0 hours and her SL balance was -40.50 hours.

Plaintiff accrued 8 AL hours and 4 SL hours during PP 12, and

used 8 AL hours during the PP 12 (Payroll Statement of Earnings,

PP 12, 2005, Exhibit 6).

19.  PP 13 for calendar year 2005 ran from May 29-June 11, 2005.  At the beginning of PP 13, plaintiff's AL balance was 0 hours and her SL balance was -36.50 hours.  Plaintiff accrued 8 hours AL and 4 hours SL hours during PP 13, leaving her with a balance of 8 AL and - 32.50 SL hours at the end of PP 13 (Payroll Statement of Earnings, PP 13, 2005, Exhibit 7).

20.  On May 31, 2005, plaintiff telephoned her office and left a message indicating that she would be on LWOP for that day (Exhibit 5 at 3).

21.  Plaintiff returned to work on June 1, 2005, and advised her supervisor, Ms. Huger, that she wanted to change her LWOP status on May 31, 2005, to AL. Id.

22.  In reviewing plaintiff's request to use AL for her May 31, 2005, absence, Ms. Huger confirmed with Selina Jameson, Time and Attendance record-keeper for the unit, that plaintiff had an AL balance of 0 at the beginning of PP 13.  Ms. Huger discussed plaintiff's request with UC Haase, who advised Ms. Huger that she would not approve plaintiff's request for advance AL (Id. at 4).

23.  In Ms. Huger's experience as a supervisor, plaintiff is the only employee who has requested to be granted AL when not having that leave available to take.  Ms. Huger has not authorized advanced leave for any employee. Id.

24.  Plaintiff is the only employee under Ms. Huger's

5

supervision who has taken LWOP because their leave balance was exhausted. Id.

25.  During her tenure as Section Chief of the Security Division, Ms. Durkin's policy her been not to approved advance AL.  SC Durkin has never authorized advance AL for any employee (Exhibit 2 at 4-5).

26.  FBI policy is that an employee does not accrue leave for a pay period until the end of that pay period.  The advancement of AL or SL to an employee is not an entitlement.  It is within a supervisor's discretion whether or not approving an employee's request for advance leave is in the best business interest of the FBI (Exhibit 4 at 4; FBI Leave Policy Manual, Exhibit 8).

27.  The FBI's Leave Policy Manual states, in pertinent part, that leave "does not accrue for partial pay periods at the beginning or end of employment." Id.

28.  The FBI Leave Policy requires an employee to successfully complete a full pay period in order to accrue leave during that pay period (Exhibit 4 at 4).

29.  OPM policy also demonstrates that employees do not have an entitlement to advance annual leave (OPM Leave Policy Manual, Exhibit 12).

31. Plaintiff has never sought a reasonable accommodation through the FBI's Office of Equal Employment Opportunity Affairs

Reasonable Accommodation process (Exhibit 3 at 4).

    32.  According to the Equal Employment Opportunity

Commission's ("EEOC") Technical Assistance Manual, the granting

of LWOP, when no accrued annual leave exists, is a recognized

form of reasonable accommodation when necessitated by an

employee's disability (EEOC Technical Assistance Manual, Exhibit

13).

                        Respectfully submitted,

                        __/s/_____
                        JEFFREY A. TAYLOR, D.C. BAR # 498610
                        United States Attorney


                        __/s/_____
                        RUDOLPH CONTRERAS, D.C. BAR # 434122
                        Assistant United States Attorney


                        __/s/_____
                        DIANE M. SULLIVAN, D. C. BAR # 12765
                        Assistant United States Attorney
                        Judiciary Center Building
                        555 Fourth Street, N.W.
                        Room E4919
                        Washington, D.C. 20530
                        (202) 514-7205

Of Counsel:
JON A. MELLIS
Assistant General Counsel
Federal Bureau of Investigation


                            7

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
SANDRA RAGSDALE              )
                            )
            Plaintiff,       )
                            )
        v.                   )     Civil Action No. 07-1256(RBW)
                            )
ALBERTO GONZALES             )
U.S. Department of Justice, )
                            )
            Defendant.       )
_____)
```

**INDEX**[1]

| | |
|---|---|
| Exhibit 1 (15 pages) | Ragsdale Affidavit |
| Exhibit 2 (5 pages) | Durkin Affidavit |
| Exhibit 3 (8 pages) | Haase Affidavit |
| Exhibit 4 (6 pages) | DeLoach Affidavit |
| Exhibit 5 (5 pages) | Huger Affidavit |
| Exhibit 6 (2 pages) | Earnings and Leave Record (pp. 12) |
| Exhibit 7 (2 pages) | Earnings and Leave Record (pp. 13) |
| Exhibit 8 (3 pages) | Earnings Rate |
| Exhibit 9 (2 pages) | Leave Account (pp. 15-28) |
| Exhibit 10 (4 pages) | Leave Policy Reminders (dated March 15, 2005) |
| Exhibit 11 (Underseal) | Plaintiff's Medical Records |
| Exhibit 12 (4 pages) | OPM Leave Policy |
| Exhibit 13 (19 pages) | FBI/EEOC Reasonable Accommodation Policies |

---

[1] Page count for the exhibits does not include the cover sheet.

Exhibit 1

Washington, D.C.

## SWORN STATEMENT

I, Sandra Ragsdale, Personnel Security Specialist, Security Reinvestigations Unit, Personnel Security Section, Security Division (SecD), of the Federal Bureau of Investigation (FBI), do hereby solemnly swear to the following:

I have been advised by SSA Fred J. Gregory of the Office of Equal Employment Opportunity Affairs (OEEOA) of the FBI that he is investigating my complaint of employment discrimination (F-05-6061) pursuant to Title 29 of the Code of Federal Regulations, Part 1614.

I understand that the allegation accepted for investigation is whether I was discriminated against based on my disability (physical) when: on June 2, 2005, I was required to take leave without pay for my absence on May 31, 2005, although I requested annual leave.

My enter on duty date with the FBI is 08/07/1973. I have been in my current position in the Security Reinvestigation Unit of the SecD since July of 2005. However, I have been in the SecD since 1986, and many of the units I have been assigned to have reorganized under different names.

Page 1 of 14 pages                    Affiant's Initials S.R.

Due to a reorganization I was previously placed under the supervision of Supervisory Personnel Security Specialist Winifred Huger in the Clearance Passage and Adjudication Unit (CPAU) from November 2004 to July 2005. I received a call at home while I was recuperating from major surgery that Ms. Huger was my supervisor again. I was upset because I knew she still harbored ill feelings against me and she would not be fair. I returned to work with the attitude that if she treats me with respect, I will treat her with respect. At that time the Acting Unit Chief of the CPAU was Wyelene Haase.

The following is a list of my major medical conditions which contribute to my disability. I suffer from Asthma, Systemic Lupus Erythematosus, Hiatal Hernia, Gastroesophageal Reflux Disease, Arthritis, Bilateral Patellar Chrondromalacia, Irritable Bowel Syndrome, Multiple Chronic Allergies and Fibromyalgia. The basis of my disability is the result of a fall at FBIHQ which required surgery on both knees. (I have 30% disability in one knee and 40% disability in the other.) This results in chronic pain and difficulty walking, and also pain and swelling and other symptoms (fatigue) from the Lupus condition.

I must use a cane to assist in walking. Due to the pain and swelling, from my disability and Lupus symptoms which at times make it impossible for me to be mobile, I have had to take

considerable time off from work. (to include doctors'
appointments, lab work, hospital appointments etc.)  In addition,
I also need to take time off when there is snow or ice because of
the danger of falling as a result of my  mobility with the use of
a cane.  When I am able to come to work, I have no problem
performing my job. I received exceptional performance ratings,
meet expectations ratings, time off awards, and monetary awards.
I am a dedicated, hardworking and productive employee. (I have
had fewer delinquencies than some employees who come to work
every day.)

The management that I currently work for is aware of my
condition.  In fact, a folder is maintained by my supervisor
containing my medical documentation, that I have provided to each
supervisor I have worked under.  When I worked for Ms. Huger and
Ms. Haase (only 8 months), both were aware of my disability and
medical conditions.  I would note that I previously briefly
worked under Ms. Huger during the period of 1995-1996.

During that time there was an Office of Professional
Responsibility (OPR) matter (approx. 03/26/1997) involving Ms.
Huger which involved her illegally trying to drop me from an
Exceptional performance rating to a Fully Successful with
minimally acceptable in case management. She also falsely accused
me of not turning in 70 cases when I observed her removing mail
from numerous hanging folders that I normally used (flourescent

Page 3 of 14 pages                    Affiant's Initials S.R.

colors.) The end result, the illegal performance rating was destroyed. She has held a grudge against me about this incident. She would pass me in the hallway and not speak at all. I spoke to her and she barely spoke back. Her attitude was hostile.

As I discussed above, as a result of my medical condition, I have had to use a considerable amount of annual and sick leave.  This has resulted in me having a negative sick leave balance. This has also resulted on occasion in my having to go on leave without pay (LWOP).  I was even in the "leave sharing program" until they changed their rules.  So I had to rely on the 8 hours of AL that I accrued.  There were no issues with my taking leave with any other supervisors prior to Ms. Huger and Ms. Haase.

The following is a history of events which documents my complaint:

During the meeting on March 3, 2005 with Ms. Huger and Ms. Haase, (held in Ms. Haase's Office), I was told the following:

1. **My calling in sick is a problem and it was also a problem with the Section Chief Sharon Durkin.** (Note: it was never a problem before with other supervisors, unit chiefs and section chiefs.)

2. **My LWOP status is an issue and AWOL is the next procedure or step.**

Affiant's Initials S.R.

3.   I must come to work and cannot call in during inclement
weather (snow/ice) because other people are coming in to work.
Ms. Haase further stated that she doesn't understand why I can't
come to work on ice.  (Note: I have a well documented, well known
work related injury wherein I have disability in both knees and
utilize a cane since 1986. I have Chondromalacia Patella of both
knees from the fall at FBIHQ.)


4.   She wanted full time employees to work for her. ( Note: I am
a full time permanent employee.  There are part time employees in
the Security Division, specifically Cynthia Friej)

5.   She will not approve any more LWOP for me after I turned in
my leave slip for 2/22/2005 through 03/01/2005. (Four days were
for inclement weather)

6.   Ms. Haase acknowledged that she read my unit folder which has
documentation regarding my illnesses, however, to her it was
still and issue.  (Note: it was never a problem before with other
supervisors, unit chiefs and section chiefs.)

7.   Ms.  Haase acknowledged that although I will be out of the
negative status for the 60 hours of sick leave this summer 2005,
it is still too long a time period to be in the hole.

8.  **Ms. Haase also told me that I would not make the five years (2010) that I have left to retire from the Bureau.**  (This was a threat that she issued to me.)

I advised Ms. Haase and Ms. Huger during the meeting that my work was not being affected as Ms. Haase said it was.  I showed her my stats which disclosed that I had closed 19 cases for the month. ( Very few employees close that many cases within a month. Some closed less than 10 cases a month.)  Ms. Haase said oh, well that's good. I further advised them that I had fewer delinquencies than some of the employees who come to work every day. (This used to be stated by my previous Supervisor Linda Horoschak)   This did not matter to Ms. Haase or Ms. Huger.

        Ms. Haase was working with Ms. Huger in trying to harm me and to destroy my career with the FBI.  After this meeting, I went to my desk in shock, I could not believe they would try to do this to me.  I could see if I was not a good worker.  They have given me projects and I successfully completed them.  I have never abused leave everything was documented.  I emailed Ms. Haase with a copy to Ms. Huger the same day advising that I would come to work regardless of the circumstances so they would not take diverse actions against me.

        After speaking with other bureau personnel about the meeting, I was informed that Ms. Huger and Ms. Haase could not legally do this to me.  I was informed to ask them to put it in

Page 6 of 15 pages                    Affiant's Initials S.R.

writing.  By email to Ms. Haase with a copy to Ms. Huger, dated
Friday, March 4, 2005 at 9:47 a.m., I asked for a formal
communication (ec or memo) to document the meeting outlining the
issues and restrictions mentioned in the meeting.  It took until
Monday, March 7, 2005 at 12:46 p.m. for a response from Ms.
Haase.  In her response Ms. Haase lied and said that I
misrepresented what she said. She basically denied everything.
She turned the entire incident around and based the AWOL
statement on "unscheduled absences" from work and my calling in
at 3:30 a.m. to 4:30 a.m., instead of speaking to a supervisor.
**Ms Haase then stated that my medical problems were clearly
articulated and understood.**

I replied with my email to Ms. Haase and Ms. Huger on
Monday, March 7, 2005 at 3:05 p.m. and advised that I did not
misrepresent what she said.  I noted the fact that I repeated
what she said before I wrote it down.

I also informed her that if she was now basing her AWOL
statement on me calling in around 3:30 a.m. to 4:30 a.m., which I
was given permission to do so (note: due to illness and
medication) by the previous administration and also by Ms. Huger
(on 02/10/2005, 12:50 in the afternoon.) I also informed her that
my unscheduled leave was mainly due to medical problems
that she stated was clearly articulated and understood.  I
mentioned that  it was unfair to me being threatened with AWOL

when I was given permission to call in odd hours and leave messages on the voice mail. I never received a reply from Ms. Haase or Ms. Huger. After this meeting on the 15th of March, 2005, Ms. Haase distributed an ec to everyone in our office regarding "Leave Policy Reminders" which was drafted by Michael Ramsburg. I have noticed Ms. Haase on occasion speaking with him in the hallway.

As a result of this treatment from Ms. Huger and Ms. Haase, I was stressed and coming to work ill and not seeing my doctor regularly for treatment. Although I cannot control illnesses, I was working with an infection in my body (in a lot of pain) so they would not put me on AWOL. In my thirty-two years of bureau service, I have never been on AWOL and did not want that on my record due to unprofessional and vindictive people. When I did finally get to see my doctor for my illness and infection and told him what was going on at work, he informed me that I could sue the Bureau for what they were doing to me as he always has provided me with doctors' notes. He also advised me to always seek medical help for myself regardless of what is being done to me.

I was sent a copy of an email (original went to Ms. Haase) March 30, 2005 from a field Security Officer, Mr. Bustamante complimenting my work advising that my communication was the best written communication he has ever seen coming out of

Page 8 of 14 pages                    Affiant's Initials S.R.

the Security Division.  I thanked him for it and hand delivered a
copy to Ms. Huger's desk and the Section Chief Ms. Durkin's
office.  To date, neither of the three ever acknowledged receipt
of the email nor said anything about it to me. If it was any
other employee, they would have sent their comments to them or
done even more about it.  They are very unprofessional and cruel.

When this method (the meeting and trying to put me on
AWOL) did not work out, the next thing was Ms. Huger's and Ms.
Haase's attack with my earning and usage of annual leave which
resulted in this EEO complaint. (They knew I would need to use
annual leave that I earned for my medical problems - disability.)

In my 32 years of Bureau service, I have never had any
problems with the earning and usage of annual leave until this
incident with Ms. Huger and Ms. Haase.  Ms. Huger had previously
approved the leave until I called into her for 8 AL on 5/31/2005,
due to illness.  She said ok over the telephone but when I
returned to work the next day 06/1/2005 and filled out the leave
slip for 8 AL (pay period (pp)13), Ms. Huger informed me that I
did not have AL on the books.  I told her that I did have the 8
AL as I earned it for pp13 and I will check with the leave
clerks: Germaine Bradshaw and Selina Jameson.  Ms. Huger did not
care.  I noticed that Ms. Huger made a note on my time and
attendance register (a small yellow sticky) AL for May 31, 2005,
then she crossed through it and put LWOP.

The same day (06/01/2005), that evening before I left to go home (work hours' 6:30 a.m. to 3:00pm) I was returning to the unit from the ladies room, Ms. Huger crossed in front of me from an area of the unit and she looked directly in my face with an evil smirk on her face as if to say I got you now. I was so startled that I actually stepped back. I went home and prayed. I felt Ms. Huger was going to do something underhanded and I prayed to God to protect me from whatever she was planning to do.

The next day, (06/02/2005) as soon as she arrived at work, she came to my desk. I was on the telephone and I immediately got off to see what she wanted. Ms. Huger stood at my desk and said in a very smug tone "You don't have any annual leave and it is up to my discretion and I say you take leave without pay!" I was devastated. I went to EEO counselor Madeline Lewis and made a complaint because she was forcing me to take leave without pay when I earned AL. Ms. Huger advised it wasn't on the books.

Another instance, the leave clerk Selena Jameson clearly wrote 8 Al on the back of the sign in register (the 8 AL was added onto the 16 hours of AL for a total of 28 hours of AL) and Ms. Haase/Ms. Huger still insisted I did not have it (the 8 AL) and forced me to take LWOP. **(Acting Unit Chief Wyelene Haase wrote the following note to me: "The 8 hours on the slip are not**

Page 10 of ~~14~~ 15 pages                    Affiant's Initials S.R.

**accrued until the end of pp 15 (pay period). Therefore, you do not have 8 AL to take on 06/29/2005.")**

No one else received this treatment in my unit. This was costly to me as well as unfair and stressful. My medications have cost $200.00. This unfair treatment of forcing me to take LWOP when I have AL resulted in a financial loss of approximately $273.20 a day. It is bad enough that I couldn't advance sick leave due to the actions of AD Berkin and Phalen not approving it even for my major surgery in 2004 and I was forced to be on LWOP that entire period. (Sept through Nov when I was just 60 hours of SL in the hole with five more years to work before I retire; meaning it would be paid back.) Now, due to a vendetta/and my disability, I am forced again to take LWOP when I had AL.

Ms. Huger came up with the notion I could only use AL that was earned each pp on the very last day of the pay week. Pay period 13 began on May 29,2005, and ended June 10, 2005. According to Ms. Huger and Ms. Haase I could only use the AL on the last day of the pay period which would be June 10, 2005 and not before that time. I have spoken with several supervisors and leave clerks who never heard of such a thing. No one else in my unit was subjected to this and there were individuals who were in an LWOP status. Ms. Huger tried to put me on LWOP again on 06/28/2005, when I had AL from pp13 and pp14. Ms. Huger along

with Ms. Haase were intent in hurting me financially any way they could using their positions of authority as weapons.

I have my statements to prove that I had previously earned the annual leave when I was forced to take LWOP.

Ms. Huger and Ms. Haase discriminated against me (forced me to take LWOP on two occasions when I had annual leave) due to my medical conditions (disability) and also from the previous OPR matter in the past involving Ms. Huger and myself. Ms. Huger still harbors a grudge due to her actions in this matter. Due to the actions of Ms. Huger and Ms. Haase, I have been the victim of the following DOJ Order 1630.1B which states: "Leave must not be denied or cancelled for arbitrary or capricious reasons." and "Denial or cancellation of leave is not disciplinary in nature and must not be used as a punitive measure."

I love working for the FBI. I have always been a loyal employee with great ratings. I have been assigned numerous cases and special projects which I have always handled them in an efficient manner. I need my job as well as everyone else. I do not deserve the attacks from Ms. Huger and Ms. Haase and I need this matter to be addressed with professionalism, fairness and integrity that were apparently not shown by Ms. Huger and Ms. Haase etc. I am willing to take a polygraph examination for all that I have said.

Page 12 of ~~14~~ 15 pages                    Affiant's Initials S.R.

## WITNESSES

The following is a list of witnesses I would like interviewed, and a description of the information they can provide:

1.  Supervisory Personnel Security Specialist Linda Horoschak - I previously worked under her supervision and she can provide information about the high quality of my work and that she did not have a problem with my leave status or with me calling into work.  She received my calls and messages.

2.  Germaine Bradshaw - she previously kept the T and A records for the unit I worked in and she can provide information that there was not a problem with me calling in or with my leave status. She can also provide information concerning my health.

3. Selina Jamison - kept the T and A records shortly after Ms. Bradshaw.

4.  Unit Chief Roger Pendenza -  my previous Unit Chief before Ms. Haase. He can provide information concerning my work, my leave status and about me calling in (he received some of my calls and messages and there was not a problem.)

## CORRECTIVE ACTION

I am seeking the following corrective action:

1.  As long as I am working in the Bureau (my retirement is 12/26/2010) I will never to have to work under Supervisor Huger, Unit Chief Haase and Section Chief Sharon Durkin.

2.  To be permitted to take annual leave like every other employee in the Bureau and not on the very last day of the two-week period.

3.  To be reimbursed one month of annual leave for being forced to take LWOP when I had annual leave.

4.  To be reimbursed $2000.00 (two thousand dollars) for pain and suffering and financial difficulty due to this incident.

5.  To never be forced again to take LWOP when I have annual leave.

I do not have any knowledge of any additional information that I believe is relevant to the scope of the inquiry as described to me by SSA Gregory.

I have read this statement consisting of <u>14</u> pages.  The entire statement is true and complete to the best of my knowledge and belief.  I understand that the information I am giving is not to be considered confidential and that it may be shown to interested parties.

_____
Sandra Ragsdale

Sworn to and subscribed before me at Washington, D.C., on this <u>6th</u> day of February 2006.

_____
SSA Fred J. Gregory
EEO Investigator

Page 15 of <u>14</u> pages                    Affiant's Initials <u>S.R.</u>

Exhibit 2

Washington, D.C.

## SWORN STATEMENT

I, Sharon Durkin, Section Chief (SC), Personnel Security Adjudications Section, Security Division (SecD), of the Federal Bureau of Investigation (FBI), do hereby solemnly swear to the following:

I have been advised by Supervisory Special Agent (SSA) Fred J. Gregory of the Office of Equal Employment Opportunity Affairs (OEEOA) of the FBI, that he is investigating a complaint of employment discrimination (F-05-6061) pursuant to Title 29 of the Code of Federal Regulations, Part 1614.

I understand that the claimant is Sandra Ragsdale, and that the allegation accepted for investigation is whether she was discriminated against based on her disability (physical) when: on June 2, 2005, she was required to take leave without pay for her absence on May 31, 2005, although she requested annual leave.

Name: Sharon Durkin
FBI Enter on Duty Date: March 2004
Disability: None

I have been in my current position as SC of the Personnel Security Adjudications Section (PSAS) since July 2005.

Page 1 of _5_ pages                    Affiant's Initials _SD_

I was previously the SC of the Personnel Security Section (PSS) from March 2004 to July 2005. One of the units under my chain of command while SC of the PSS was the Clearance Passage and Access Unit (CPAU), which Ms. Ragsdale was assigned to. Up until November 2004, Ms. Ragsdale's Unit Chief (UC) in the CPAU was Roger Pendenza. From November 2004 to July 2005, Ms. Ragsdale worked under Acting UC Wyelene Haase.

I first became aware of issues involving Ms. Ragsdale's excessive use of leave sometime around the summer of 2004. I recall at that time Ms. Ragsdale had submitted a request to advance sick leave (SL) in anticipation of an upcoming surgical procedure. In reviewing her request and discussing her situation with UC Pendenza, I became aware that Ms. Ragsdale had a history of being absent from work on a regular basis, and despite being a long time employee of the FBI, she had exhausted all of her SL and annual leave (AL). In fact, from discussion with UC Pendenza, it was apparent that Ms. Ragsdale was more often absent from work than at work. I believe this is also when I first learned that Ms. Ragsdale had Lupus and utilized a cane to walk.

I discussed Ms. Ragsdale's request for advance SL with Deputy Assistant Director (DAD) Jeffrey Berkin of the SecD. DAD Berkin requested Ms. Ragsdale's time and attendance (T and A) records to review prior to making his decision regarding her request. I was later advised by DAD Berkin that based on his review of Ms. Ragsdale's T ands A records, he denied her request

Page 2 of_5__ pages            Affiant's Initials  _____

for advanced SL, and Ms. Ragsdale would in the future be required
to be placed on leave without pay (LWOP) for her absences if she
had no leave available to take.  At this same time, DAD Berkin
advised me that I needed to pay close attention to those
employees in my section who were demonstrating a pattern of
excessive use of leave, which had been the case for Ms. Ragsdale.
DAD Berkin made clear that this had been an issue within the
SecD, and those employees who were chronically absent from work
had to be addressed because their constant absence was effecting
the efficiency of the division.

I recall contacting the Performance, Recognition and
Awards unit (PRAU) for guidance in this matter.  At that time I
also advised the UCs under my chain of command that it would be
my practice going forward not to approve AL or SL being advanced
to employees.  I felt this was a necessary practice to curb what
had become a systemic problem of long term employees being
frequently absent from work, to the point they had no leave
balances available, or carried a negative balance.

I recall at some point Acting UC Haase advising me that
Ms. Ragsdale had continued to utilize her leave as soon as she
was earning it, and continued to be frequently absent, to include
periods of time being placed on LWOP.  Acting UC Haase further
advised me that Ms. Ragsdale usually never gave any advance
notice of her intention to be out on leave, but would typically
call in and leave a voice mail very early in the morning before

Page 3 of _5_ pages                    Affiant's Initials  _SDV_

anyone was in the office. Acting UC Haase advised me that she met with Ms. Ragsdale and counseled her about her attendance issues, advising her that she needed to start coming to work on a regular basis, or if she could not maintain regular attendance based on her physical condition, what options were available to her. I remember that Acting UC Haase advised me that after this meeting, Ms. Ragsdale's attendance improved greatly for a period of time.

I recall that in the May 2005 time frame Acting UC Haase advising me of an issue concerning an employee requesting annual leave who did not have annual leave accrued on the books, and therefore was placed on LWOP. In doing so, Acting UC Haase would have been adhering to my established practice. I don't have a recollection of who the employee was, but it is possible that it was Ms. Ragsdale. As I recall, there was also some question as to whether this employee would have accrued leave since they had been on LWOP during the previous pay periods. In any event, based on the information provided to me by Acting UC Haase, it was clear that this employee did not have the accrued leave at the time she requested to be placed on AL.

While I have been an SC in the SecD, the only instance in which I have authorized the advancement of AL has been a situation where an employee transferred from another federal agency, and their leave had yet to transferred to the FBI. In these situations, the employee had accrued AL from their previous

Page 4 of _5_ pages                    Affiant's Initials  _____

employment with the government, it just had yet to be officially transferred to the FBI.  I have certainly never authorized advance AL for an employee who because of excessive absenteeism had no leave balance available to use.

I do not have any knowledge of any additional information that I believe is relevant to the scope of the inquiry as described to me by SSA Gregory.

I have read this statement consisting of five pages. The entire statement is true and complete to the best of my knowledge and belief.  I understand that the information I am giving is not to be considered confidential and that it may be shown to interested parties.

_____
Sharon Durkin

Sworn to and subscribed before me at Washington, D.C., on this 25th day of January 2006.

_____
SSA Fred J. Gregory
EEO Investigator

Page 5 of _5_ pages          Affiant's Initials  _____

Exhibit 3

Washington, D.C.

## SWORN STATEMENT

I, Wyelene C. Haase, Unit Chief (UC), Analysis and Investigations Unit, Personnel Security Adjudications Section, Security Division (SecD), of the Federal Bureau of Investigation (FBI), do hereby solemnly swear to the following:

I have been advised by Supervisory Special Agent (SSA) Fred J. Gregory of the Office of Equal Employment Opportunity Affairs (OEEOA) of the FBI, that he is investigating a complaint of employment discrimination (F-05-6061) pursuant to Title 29 of the Code of Federal Regulations, Part 1614.

I understand that the claimant is Sandra Ragsdale, and that the allegation accepted for investigation is whether she was discriminated against based on her disability (physical) when: on June 2, 2005, she was required to take leave without pay for her absence on May 31, 2005, although she requested annual leave.

Name: Wyelene C. Haase

Enter on Duty Date: 11/22/87 (Support)
                    11/21/94 (Special Agent)

Disability: None

Page 1 of 8  pages                    Affiant's Initials _WMH_

I have been in my current position since October 2005. I was previously the Acting Unit Chief of the Clearance Passage and Access Unit (CPAU), SecD. While in the CPAU, Ms. Ragsdale was under my chain of command. Ms. Ragsdale's immediate supervisor in the CPAU was Supervisory Personnel Security Specialist Winifred Huger. I was aware from Ms. Ragsdale that she has Lupus, has pain in her knees, and has a variety of ailments, most of which I believe are related to her Lupus condition. I don't recall Ms. Ragsdale providing me medical documentation about her condition, but I believe she provided this type of information to Ms. Huger and/or her previous supervisors she has worked under, to include notes from doctors.

While I was assigned to the CPAU, Ms. Ragsdale was frequently absent from work. In fact, she carried a negative balance for sick leave, and her annual leave balance was usually zero. As soon as Ms. Ragsdale would earn eight hours of leave, she would immediately use the leave by calling in claiming to either not be feeling well, or that she could not make it in to work because of weather conditions. Since she did not have sick leave, she would utilize her annual leave if she had any available. Often Ms. Ragsdale had no annual leave, and would

still call in and request to be placed on leave without pay (LWOP) status.

Ms. Ragsdale would usually advise either me or Ms. Huger she would not be coming into work by leaving a voice mail the morning of her absence. Typically, she would call in between 3:00 am and 4:00 am, so no one would be available to take her call in the office. Some of Ms. Ragsdale's absences were attributed to inclement weather being forecasted, and she would not show up for work, regardless of the actual weather. During one of her early morning voice mail messages in late February 2005, Ms. Ragsdale queried about the possibility of being advanced annual leave, since she was at a zero balance.

Ms. Ragsdale's frequent absences affected her work production, and the overall efficiency of the unit. I spoke with the Performance, Recognition and Awards Unit for guidance in a situation where an employee was frequently absent from work, and had utilized all of their leave to the point where they were often on LWOP. I was advised to provide Ms. Ragsdale with a "leave" letter advising her that her regular attendance at work was required as a condition of her employment, and that in the future she would have to have leave approved beforehand by either me or Ms. Huger, and that she would need to provide a doctor's note on those occasions that her absence was related to her health. I

Page 3 of 8   pages                    Affiant's Initials /NHH

drafted a letter to Ms. Ragsdale concerning her excessive absenteeism. However, I decided to meet with her first to discuss her attendance issues to see if the matter could be resolved before providing her with the letter.

On March 3, 2005, I met with Ms. Ragsdale to discuss her excessive use of leave and excessive absenteeism from work. Ms. Huger also attended the meeting. I discussed with Ms. Ragsdale that her excessive use of leave, to include LWOP, was not something that could continue. I discussed with Ms. Ragsdale options for her to consider to assist in her situation. These options were to seek assistance/advice from the Employee Assistance Program, the Voluntary Leave Transfer Program, the Employee Benefits Unit (regarding retirement and/or a disability retirement), the Reasonable Accommodations Committee of the FBI's Office of Equal Employment Opportunity Affairs, and to explore invoking the Family Medical Leave Act.

I noted that during the meeting Ms. Ragsdale was clearly agitated by the fact that her excessive absenteeism was being addressed. It was my understanding that up to that point, previous supervisors had allowed her to take excessive leave, which resulted in the situation she found herself in, which was a negative sick leave balance, no annual leave, and regularly calling in to take LWOP. During this meeting I also advised Ms.

Page 4 of _8_ pages                    Affiant's Initials _____

Ragsdale that I had discussed her request for advanced annual leave with Section Chief (SC) Sharon Durkin of the Personnel Security Section (PSS), and that her request had been denied.

The following is my recollection concerning the specific issue in Ms. Ragsdale's complaint. Unit records indicate that Ms. Ragsdale called in on LWOP May 23 through May 25, 2005. She then attended two days of training. The next Monday, May 30, 2005, was the Memorial Day Holiday. Ms. Ragsdale did not show up for work the next day, May 31, 2005. I believe that she left a voice mail for Ms. Huger indicating she was not coming in to work, but I don't know if she indicated she wanted to be placed on LWOP or annual leave. I recall that Ms. Huger came to me and asked if Ms. Ragsdale could be placed on annual leave. Ms. Huger further advised me that Ms. Ragsdale apparently did not have the necessary accrued annual leave to take annual leave for the day. I advised Ms. Huger that if she did not have the accrued leave, Ms. Ragsdale should be placed on LWOP status.

As I discussed above, Ms. Ragsdale had previously requested advanced annual leave, which I had discussed with SC Durkin on March 2, 2005. At that time, SC Durkin would not approve the advance of annual leave. In fact, it has been SC Durkin's policy for the PSS that annual leave would not be advanced. In addition, any requests for advanced sick leave must

Page 5 of _8_ pages                Affiant's Initials /MMH/

be personally granted by the Deputy Assistant Director of the SecD.  To the best of my knowledge from leave records I have reviewed, Ms. Ragsdale carried a zero balance of annual leave into pay period 13, which began on May 29, 2005.  Therefore, it would be my understanding that Ms. Ragsdale would not have accumulated eight hours of annual leave until the end of that pay period, therefore, she would not have had the necessary leave on the books to be placed on annual leave on May 31, 2005.  If Ms. Ragsdale was under the impression that she was entitled to use eight hours of annual leave at the beginning of a pay period in which she carried a zero balance of annual leave, that is not something she ever discussed with me.

I would note that after I discussed with Ms. Ragsdale on March 3, 2005, her excessive use of leave, her attendance improved greatly until the end of the May 2005 time frame.  In fact, on April 21, 2005, I advised Ms. Ragsdale that I was proud of the manner in which she had responded by improving her attendance.  In addition, those days that Ms. Ragsdale did show up to work, she was generally productive.  Since I observed this improvement in her attendance, I decided to hold in abeyance the leave letter that I had prepared for Ms. Ragsdale.

While I have been an Acting Unit Chief and Unit Chief in the SecD, the only instances in which I have approved advanced

Page 6 of  8   pages                    Affiant's Initials  _____

annual leave are situations where an employee has begun employment with the FBI after leaving another federal agency, and there was a delay in their leave records being transferred to the FBI.  In those instances, the employee had accrued annual leave, however, the necessary paperwork had not been forwarded to the FBI from their previous agency.  I have never approved the advancement of annual leave to an employee under a similar circumstance such as Ms. Ragsdale; that is, an employee who has had a history of excessive absenteeism and/or excessive use of leave.

I do not have any knowledge of any additional information that I believe is relevant to the scope of the inquiry as described to me by SSA Gregory.

I have read this statement consisting of eight pages. The entire statement is true and complete to the best of my knowledge and belief.  I understand that the information I am giving is not to be considered confidential and that it may be shown to interested parties.

*Wyelene C. Haase*

Wyelene C. Haase

Page 7 of 8 pages                    Affiant's Initials _____

Sworn to and subscribed before me at Washington,

D.C., on this ____ day of ~~February~~ 2006.

_____
SSA Fred J. Gregory
EEO Investigator

Page 8 of_8__ pages                    Affiant's Initials

Exhibit 4

Lakeland, Florida

## SWORN STATEMENT

I, Maureen A. DeLoach, Human Resources Specialist (HRS), Performance Recognition and Awards Unit (PRAU), Administrative Services Division (ASD), of the Federal Bureau of Investigation (FBI), do hereby solemnly swear to the following:

I have been advised by Supervisory Special Agent (SSA) Fred J. Gregory of the Office of Equal Employment Opportunity Affairs (OEEOA) of the FBI, that he is investigating a complaint of employment discrimination (F-05-6061) pursuant to Title 29 of the Code of Federal Regulations, Part 1614.

I understand that the claimant is Sandra Ragsdale, and that the allegation accepted for investigation is whether she was discriminated against based on her disability (physical) when: on June 2, 2005, she was required to take leave without pay for her absence on May 31, 2005, although she requested annual leave.

Name: Maureen A. DeLoach

Enter on Duty Date: April 21, 2002

Disability: None Claimed

Page 1 of_6_ pages                    Affiant's Initials _MAD_

I am currently an HRS assigned to PRAU. I was a Supervisory HRS (SHRS) from April 2002 until June 2005. Among a variety of functions, the PRAU is responsible for setting policy, and providing guidance for all FBI leave programs.

My records indicate that UC Wyelene Haase sent me an e-mail dated November 23, 2004, regarding leave issues she was having with Ms. Ragsdale, who was under her chain of command. UC Haase was seeking advice because Ms. Ragsdale had negative balances in both her annual leave and sick leave, and she was not earning any leave as of pay period 23 because she had accrued 80 hours of leave without pay (LWOP) in that pay period. I had a subsequent conversation with UC Haase who provided additional details concerning Ms. Ragsdale, to include that she frequently called in on leave without providing any advance notice, often calling and leaving a voice mail in the early morning hours before anyone arrived to the office. In addition, she had been using her sick leave and annual leave as soon as she accrued it, and her frequent absences were impacting the efficiency of the unit to which she was assigned.

I advised UC Haase to consider issuing Ms. Ragsdale a letter of requirement which would specifically advise her of her responsibilities as an employee with regard to the use of leave. This would include the requirement to provide her supervisor with

sufficient advance notice before taking any form of leave, or that she would face the prospect of being considered absent without leave (AWOL). I advised UC Haase that if Ms. Ragsdale requested to take leave because of a medical condition, she should be advised that she will be required to provide appropriate medical documentation to support the request. In addition, I advised UC Haase that if Ms. Ragsdale called in on leave because of an emergency, she would be required to provide documentation of the emergency. I advised UC Haase if Ms. Ragsdale failed to follow these instructions, and continued to take leave without advance notice, she could be considered AWOL and that appropriate administrative action could be taken against her.

UC Haase did not contact me for guidance regarding the issue as detailed in Ms. Ragsdale's complaint. SSA Gregory has advised me that Ms. Ragsdale requested to be placed on annual leave for May 31, 2005, and that May 29, 2005, was the beginning of a pay period. SSA Gregory has further advised me that at the beginning of that pay period, Ms. Ragsdale's annual leave balance was zero, but that she requested to be placed on annual leave in anticipation that she would earn eight hours of leave for the upcoming pay period. SSA Gregory further advised me that UC

Page 3 of  6   pages                    Affiant's Initials

Haase denied that request, and that Ms. Ragsdale was placed on LWOP.

It is FBI leave policy that an employee does not accrue leave for a pay period until the end of the leave period. Therefore, if an employee carried a zero leave balance into a pay period, and they earned eight hours of leave per pay period, that leave would be accrued to them at the beginning of the successive pay period. I would note that the employee's supervisor could allow that employee to be advanced the eight hours of leave in anticipation of it being earned. However, it is purely a manager's prerogative in determining what is in the best business interest of the FBI as to whether they will approve an employee's request for advanced leave. I would note the FBI's Leave Policy Manual states that annual leave will accrue to an employee during each full biweekly pay period while in a pay status or in a combination of pay and nonpay status. Under this policy, an employee must successfully complete a full pay period in order to accrued leave (at the rate determined by the employee's years of service).

The advancement of leave, either sick leave or annual leave, is not an entitlement of an employee. If UC Haase denied Ms. Ragsdale's request for annual leave because her leave balance was zero, that would be in accordance with established FBI policy

Page 4 of 6  pages                    Affiant's Initials

and practice.  I would note that the FBI's time and attendance system will allow an annual leave request to be accepted into the system, even if an employee does not have the accrued leave. This is because the system allows for the advancement of leave provided there are enough pay periods left in the year to repay the advanced leave.  However, just because a leave request is accepted into the system, this does not indicate that the leave is already accrued to the employee's balance.

From what has been described to me by SSA Gregory, UC Haase followed established FBI practice and policy in denying Ms. Ragsdale's request to be placed on annual leave since she did not have the necessary accrued balance to take.  It was also UC Haase's prerogative as to whether she grants an employee under her chain of command advanced leave.  I would further note that if on this occasion Ms. Ragsdale called in on leave without providing advance notice to obtain her supervisor's approval to take leave, UC Haase had the option of placing Ms. Ragsdale in AWOL status, rather than granting her LWOP status.

I knew from conversations with UC Haase that Ms. Ragsdale claimed to have a medical condition, but I don't recall UC Haase providing me details about her specific condition.

I do not have any knowledge of any additional information that I believe is relevant to the scope of the inquiry as described to me by SSA Gregory.

I have read this statement consisting of six pages. The entire statement is true and complete to the best of my knowledge and belief. I understand that the information I am giving is not to be considered confidential and that it may be shown to interested parties.

_Maureen A. DeLoach_
Maureen A. DeLoach

Sworn to and subscribed before me at Lakeland, Florida, on this 9th day of February 2006.

_William Garcia_
SA William Garcia
Lakeland Resident Agency

Page 6 of 6 pages                    Affiant's Initials

Exhibit 5

Washington, D.C.

SWORN STATEMENT

I, Winifred E. Huger, Supervisory Program Manager Analyst, Law Enforcement and Contractor Adjudication Unit, Personnel Security Adjudication Section, Security Division (SecD), of the Federal Bureau of Investigation (FBI), do hereby solemnly swear to the following:

I have been advised by Supervisory Special Agent (SSA) Fred J. Gregory of the Office of Equal Employment Opportunity Affairs (OEEOA) of the FBI, that he is investigating a complaint of employment discrimination (F-05-6061) pursuant to Title 29 of the Code of Federal Regulations, Part 1614.

I understand that the claimant is Sandra Ragsdale, and that the allegation accepted for investigation is whether she was discriminated against based on her disability (physical) when: on June 2, 2005, she was required to take leave without pay for her absence on May 31, 2005, although she requested annual leave.

Name: Winifred E. Huger
Enter on Duty Date: 01/11/1986
Disability: None Claimed

Page 1 of _5_ pages                    Affiant's Initials _weh_

I have been in my current position since November 2005. Prior to that I was a Supervisory Personnel Security Specialist in the same unit which was then known as the Clearance Passage Adjudication Unit (CPAU). Sandra Ragsdale was in the CPAU from November 2004 to July 2005, and I was her immediate supervisor and rating official. I am aware from discussion with Ms. Ragsdale that she has Lupus. That is the only physical condition I am aware of concerning Ms. Ragsdale. I remember she advised me of her condition shortly after arriving in the unit. I recall that when taking leave, she provided notes from her doctor requesting she be excused from work, but I don't remember her ever submitting detailed medical documents about her condition directly to me. I am aware from observing Ms. Ragsdale that she uses a cane to walk, and when assigned to the CPAU she often mentioned that her legs were hurting her.

While Ms. Ragsdale was under my supervision, she took considerable amounts of both sick leave and annual leave. In fact, she usually had a zero balance for both, or carried a negative balance for her sick leave. I recall in March of 2005 she was counseled by the Unit Chief Wyelene Haase of the CPAU about her excessive absence from work. I remember that UC Haase presented Ms. Ragsdale with a series of options in order to address this issue, but I don't remember the specifics of what those options were.

While I was in the CPAU, I kept a calender to track the status of the employees under my supervision, and whether they were on leave. I did this so I would know who was available for work on any given day. My calender for May 2005 indicates that Ms. Ragsdale had called in on leave without pay for May 23, 2005 through May 25, 2005. I believe at that time Ms. Ragsdale had no annual leave available to take, and as I indicated above, I believe she was carrying a negative sick leave balance. On May 25 and May 26, 2005, Ms. Ragsdale attended a training class. May 30, 2005, was the Memorial Day holiday. On May 31, 2005, Ms. Ragsdale again called in on LWOP. When Ms. Ragsdale returned to work on June 1, 2005, she advised me that she wanted to change her LWOP on May 31, 2005, to annual leave.

I was aware that May 29, 2005, was the beginning of a new pay period. I wasn't sure if Ms. Ragsdale had any available annul leave, nor was I sure whether she had earned leave from the following pay period since she had been on LWOP for a couple of the days of that period. In addition, I wasn't sure at what point in this new pay period Ms. Ragsdale would accrue any earned leave. I recall I sent a e-mail to Selina Jameson, who was responsible for keeping the time and attendance records for the unit. Ms. Jameson responded via e-mail, but I was not sure if her response adequately addressed the situation. I then discussed the situation with UC Haase since most likely Ms. Ragsdale would have to be advanced annual leave. I explained to

Page 3 of _5_ pages                    Affiant's Initials  _ull_

UC Haase that Ms. Ragsdale was requesting annual leave for May 31, 2005, but did not appear to have the accrued leave on the books to take. UC Haase advised me that she would not approve Ms. Ragsdale being advanced leave, and to the best of my knowledge, Ms. Ragsdale remained on LWOP status for her absence on May 31, 2005.

Ms. Ragsdale is the only employee I recall I have ever supervised who has requested to be granted annual leave when not having that leave on the books available to take. I do not recall authorizing an employee under my supervision to take leave when they did not have the leave accrued. Ms. Ragsdale is also the only employee under my supervision who I recall has requested to be advanced leave, either annual or sick leave, and the only employee who has taken LWOP because their leave balance was exhausted.

I do not have any knowledge of any additional information that I believe is relevant to the scope of the inquiry as described to me by SSA Gregory.

I have read this statement consisting of five pages. The entire statement is true and complete to the best of my knowledge and belief.  I understand that the information I am giving is not to be considered confidential and that it may be shown to interested parties.

_Winifred E. Huger_
Winifred E. Huger


Sworn to and subscribed before me at Washington, D.C., on this __25__ day of January 2006.

_SSA Fred J. Gregory_
SSA Fred J. Gregory
EEO Investigator

Page 5 of _5_ pages          Affiant's Initials  _Weh_

Exhibit 6

# Payroll Statement of Earnings

Department of Justice - Federal Bureau of Investigation

Printable View        Exit                                          Version 2.0

## Sensitive But Unclassified - For Official Use Only

**Choose a Pay Period and click "Go"**   Year 2005 , PP 26  

Federal Bureau of Investigation
Earnings and Leave Record

| SSN | Name | Location | Pay Period Date | | Check Date |
|---|---|---|---|---|---|
| ▓▓▓▓▓ | SANDRA RAGSDALE | 1114 | 05/15/2005 - 05/28/2005 | | 06/07/2005 |
| **Salary** | **Pay Plan** | **Grade** | **Step** | **Hourly Rate** | **AVP Rate** | **Hourly AVP** | **Retirement Fund \*** |
| $71,269.00 | GS | 12 | 05 | 34.15 | 0.00 | 0.00 | $54,021.46 |
| **Health Insurance** | | | | M.D. IPA - JP1 (PRE-TAXED) | | | |

\* Does not include retirement deduction for prior periods of employment with FBI or other government agencies

## Earnings and Deductions

| Description | Hours | | Amount | |
|---|---|---|---|---|
| | **PP** | **YTD** | **PP** | **YTD** |
| Regular | 80.00 | 760.00 | 2,732.00 | 25,807.60 |
| | | | | |
| ***\*\* Pay Period Hours and Gross Pay*** | **80.00** | | **2,732.00** | **25,807.60** |
| | | | | |
| Federal Tax - Exempts M 000 | | | 337.25 | 3,097.04 |
| Extra Federal Tax | | | 13.00 | |
| State Tax MD - Exempts 00 | | | 175.00 | 1,595.00 |
| Retirement | | | 191.24 | 1,806.55 |
| Medicare Tax Withheld | | | 39.03 | 367.31 |
| Life Insurance | | | 34.44 | 410.76 |
| Thrift Savings ( 1.00 %) | | | 27.32 | 258.08 |
| Health Insurance | | | 40.27 | 476.10 |
| Thrift Loan | | | 20.14 | 241.68 |
| Benevolent | | | 1.00 | 12.00 |
| Bond | | | 10.00 | 120.00 |
| Allotment 1 | | | 283.00 | 3,396.00 |
| Allotment 2 | | | 219.00 | 3,270.00 |

| | | | | 1,390.69 | 15,050.52 |
|---|---|---|---|---|---|
| *** Total Deductions | | | | | |
| | | | | | |
| *** NET PAY *** | | | | 1,341.31 | 10,757.08 |
| | | | | | |
| | | | | | |

| Year to Date Leave Status ( PP 12, 2005) | | | | |
|---|---|---|---|---|
| Type | Beg Balance | Accrued | Used | End Balance |
| Annual | 0.00 | 8.00 | 8.00 | 0.00 |
| Sick | -40.50 | 4.00 | 0.00 | -36.50 |
| Comp | 0.00 | 0.00 | 0.00 | 0.00 |
| Religious Comp | 0.00 | 0.00 | 0.00 | 0.00 |
| Travel Comp | 0.00 | 0.00 | 0.00 | 0.00 |
| Time Off Awd | 0.00 | 0.00 | 0.00 | 0.00 |

| Leave Category | 08 | Annual Leave Ceiling | 240.00 | Use or Lose | 0.00 | Bonds Issued | 01 |
|---|---|---|---|---|---|---|---|

## Messages:

CHECK SENT DD/EFT ROUTING# 055000372

ALLOT1 SENT DD/EFT ROUTING# 055003308

ALLOT2 SENT DD/EFT ROUTING# 254074413

$$ REGULAR PAY INCLUDES 376.80 LOCALITY PAY $$

SANDRA RAGSDALE
614 WAYWARD DRIVE
ANNAPOLIS , MD 214010000

Check statement to insure leave and pay are correct. If questions, write Accounting Section, Room 1907 J.E.H.
Retain this form for a record of your pay.

Exhibit 7

# Payroll Statement of Earnings
### Department of Justice - Federal Bureau of Investigation

<u>Printable View</u>          <u>Exit</u>                                                          Version 2.0

**Sensitive But Unclassified - For Official Use Only**

## Choose a Pay Period and click "Go"   | Year 2005 , PP 28 |   

Federal Bureau of Investigation
Earnings and Leave Record

### Pay Period **13 , 2005**

| SSN | Name | Location | Pay Period Date | Check Date |
|---|---|---|---|---|
|  | SANDRA RAGSDALE | 1114 | 05/29/2005 - 06/11/2005 | 06/21/2005 |
| **Salary** | **Pay Plan** | **Grade** | **Step** | **Hourly Rate** | **AVP Rate** | **Hourly AVP** | **Retirement Fund \*** |
| $71,269.00 | GS | 12 | 05 | 34.15 | 0.00 | 0.00 | $54,097.36 |
| **Health Insurance** |  | M.D. IPA - JP1 (PRE-TAXED) |

**\* Does not include retirement deduction for prior periods of employment with FBI or other government agencies**

## Earnings and Deductions

| Description | Hours | | Amount | |
|---|---|---|---|---|
|  | **PP** | **YTD** | **PP** | **YTD** |
| Regular | 31.75 | 791.75 | 1,084.26 | 26,891.86 |
|  |  |  |  |  |
| **\*\*\* Pay Period Hours and Gross Pay** | **31.75** |  | **1,084.26** | **26,891.86** |
|  |  |  |  |  |
| Federal Tax - Exempts M 000 |  |  | 80.72 | 3,190.76 |
| Extra Federal Tax |  |  | 13.00 |  |
| State Tax MD - Exempts 00 |  |  | 56.00 | 1,651.00 |
| Retirement |  |  | 75.90 | 1,882.45 |
| Medicare Tax Withheld |  |  | 15.14 | 382.45 |
| Life Insurance |  |  | 34.44 | 445.20 |
| Thrift Savings ( 1.00 %) |  |  | 10.84 | 268.92 |
| Health Insurance |  |  | 40.27 | 516.37 |
| Thrift Loan |  |  | 20.14 | 261.82 |
| Benevolent |  |  | 1.00 | 13.00 |
| Bond |  |  | 10.00 | 130.00 |
| Allotment 1 |  |  | 283.00 | 3,679.00 |
| Allotment 2 |  |  | 219.00 | 3,489.00 |
|  |  |  |  |  |

| | | | | | |
|---|---|---|---|---|---|
| *** Total Deductions | | | | 859.45 | 15,909.97 |
| | | | | | |
| *** NET PAY *** | | | | 224.81 | 10,981.89 |
| | | | | | |
| | | | | | |

| Year to Date Leave Status ( PP 13, 2005) | | | | |
|---|---|---|---|---|
| Type | Beg Balance | Accrued | Used | End Balance |
| Annual | 0.00 | 8.00 | 0.00 | 8.00 |
| Sick | -36.50 | 4.00 | 0.00 | -32.50 |
| Comp | 0.00 | 0.00 | 0.00 | 0.00 |
| Religious Comp | 0.00 | 0.00 | 0.00 | 0.00 |
| Travel Comp | 0.00 | 0.00 | 0.00 | 0.00 |
| Time Off Awd | 0.00 | 0.00 | 0.00 | 0.00 |

| Leave Category | 08 | Annual Leave Ceiling | 240.00 | Use or Lose | 0.00 | Bonds Issued | 00 |
|---|---|---|---|---|---|---|---|

## Messages:

CHECK SENT DD/EFT ROUTING# 055000372

ALLOT1 SENT DD/EFT ROUTING# 055003308

ALLOT2 SENT DD/EFT ROUTING# 254074413

$$ REGULAR PAY INCLUDES 262.58 LOCALITY PAY $$

PAY WAS ADJUSTED BY TIME CARD FOR PP: 12 2005

SANDRA RAGSDALE
614 WAYWARD DRIVE
ANNAPOLIS , MD 214010000

Check statement to insure leave and pay are correct. If questions, write Accounting Section, Room 1907 J.E.H.
Retain this form for a record of your pay.

Exhibit 8

# EARNING RATES:

Annual leave will accrue to an employee during each full biweekly pay period while in a pay status or in a combination of pay and nonpay status. Annual leave is not transferable to another individual's leave account except through a donation to an approved leave recipient under the Voluntary Leave Transfer Program.

## EARNING RATES

| YEARS OF SERVICE | FULL-TIME EMPLOYEES | PART-TIME EMPLOYEES |
|---|---|---|
| Less than 3 | 4 hours of annual leave for each full biweekly pay period. | 1 hour of annual leave for each 20 hours in a pay status |
| At least 3, but less than 15 | 6 hours of annual leave for each full biweekly pay period. The last complete pay period of the calendar year earns 10 hours. | 1 hour of annual leave for each 13 hours in a pay status |
| 15 or more | 8 hours of annual leave for each full biweekly pay period. | 1 hour of annual leave for each 10 hours in a pay status |

Leave does not accrue for partial pay periods at the beginning or end of employment, except when a holiday falls on the first Monday or the last Friday of a pay period and an employee is on the Bureau rolls the remainder of the period.

The rate of accrual change takes effect the first pay period after the prescribed years of service is completed. If the prescribed years of service ends on the first Sunday of the pay period, the change in rate of accrual takes effect in that pay period.

Creditable service includes other Government and military service.

Any debit amount of annual leave at the end of the year as a result of reduction in the leave accrual due to LWOP should be carried forward to be charged against following year accruals.

# FRACTIONAL PAY PERIODS

PRO RATA TABLE

| Biweekly Pay Period Workdays | Hourly Accrual Rate | | |
|---|---|---|---|
| | 4* | 6 | 8 |
| 1 | 1 | 1 | 1 |
| 2 | 1 | 1 | 2 |
| 3 | 1 | 2 | 2 |
| 4 | 2 | 2 | 3 |
| 5 | 2 | 3 | 4 |
| 6 | 2 | 4 | 5 |
| 7 | 3 | 4 | 6 |
| 8 | 3 | 5 | 6 |

| 9 | 3 | 5 | 7 |
|---|---|---|---|
|   | * This column may also be used for sick leave |   |   |

Pro rata credit of leave is allowed for fractional pay periods occurring within the continuity of employment when the employee's service is interrupted by a nonleave-earning period such as when he/she transfers between agencies with different pay periods or immediately prior to or following a period when he/she was under one of the following conditions:

(1) Received disability compensation under the Federal Employees' Compensation Act.

(2) Exercised statutory or regulatory restoration rights after service in the Armed Forces.

(3) Restored after a period of unwarranted suspension or removal for which retroactive compensation was paid under applicable Federal legislation.

## PURPOSE OF ANNUAL LEAVE

Annual leave is provided and used for two general purposes:

(1) To allow every employee an annual vacation period of extended leave for rest and recreation.

(2) To provide periods of time off for personal and/or emergency purposes.

An employee cannot be required to perform work when in a leave status.

## ANNUAL LEAVE CHARGES

The minimum charge for annual leave is fifteen (15) minutes; additional charges are in multiples thereof.

## APPROVAL OF ANNUAL LEAVE

The taking of annual leave is an absolute right of the employee, subject to the right of the supervisor to fix the time at which leave may be taken.

(1) As delegated by SAC or Assistant Director, the supervisor of an employee may approve leave.

(2) Prior to departing on leave, approval of leave must be confirmed.

(3) Annual leave requested while enroute on transfer may be approved by the SAC of the office from which the employee is being transferred. FBIHQ and the receiving SAC should be advised of the employee's departure date and the amount of leave being taken.

(4) The SAC may approve annual leave for himself/herself (regardless of the duration) without FBIHQ authority when remaining in the headquarters city area during that period of leave. All annual leave for the SAC when not remaining in headquarters city area is to be approved by FBIHQ. By teletype to All SACs dated 4/24/95, captioned "SAC Availability," the Director mandated SACs to remain within their division and any travel outside their division must be personally approved by the Director or the Deputy Director. By teletype to all SACs dated 6/12/95, captioned "SAC Availability," the Director modified his instructions to the following extent:

(a) If an SAC travels outside the division, he/she must be aware of the need for availability and, consequently, the need for completeness in the Executive Locator System.

(b) If an SAC must leave the division at a time when the ASAC will also be out of the division, the SAC must obtain the personal permission of the Deputy Director or the Director. A UACB communication will not suffice. Obviously, such instances should be limited and fully justifiable.

The SAC should have the necessary information electronically entered into the Executive Locator portion of the Bureau Personnel Management System AS SOON AS KNOWN in order for the Administrative Services Division to approve, unless advised to the contrary by Bureau. The SAC need only execute an FD-282 which should be retained in the field division for audit purposes. Should the requested annual leave be disapproved by the Administrative Services Division, the SAC will be telephonically notified and a written communication will follow. SACs may approve all annual leave requests for ASACs regardless of the duration of the annual leave requests or geographical location in which the annual leave is to be used. Assistant Directors must obtain prior Bureau

approval for all requests for leave.

## ADVANCED ANNUAL LEAVE

‡(1) Annual leave may be advanced to any employee (full or part time); however, the advancement of annual leave is not a vested right of the employee.

(2) Under normal circumstances, new employees must complete 90 days of service before an advance of annual leave may be approved.

(3) Employees who contemplate resigning SHOULD NOT be granted advanced annual leave (or sick leave). Employees going on maternity leave are not normally granted advanced annual leave on request; however, it can be granted in the event the granting official is certain that the individual fully intends to return to work at the end of her period of maternity leave.

‡(4) Advanced annual leave is granted only at the request of the employee; it is limited to the balance of annual leave the employee will earn through the end of the current leave year.

(5) If an employee separates from service before he/she has earned enough annual leave to pay back the amount advanced, the employee MUST reimburse the Government.

## ANNUAL LEAVE IN LIEU OF SICK LEAVE

Annual leave may be charged in lieu of sick leave provided the employee requests this change no later than 3 days after the employee's return to duty. An appropriate notation should be made on the sign-in register.

## EMERGENCY SITUATIONS

Requests for annual leave to cover an emergency situation which could not have been reasonably anticipated, such as a family illness or death, must have supervisory approval. Should an emergency occur outside of office hours, the office should be notified or the supervisor may be contacted at home. No distinction is made on the register in recording the annual leave. A tardiness is not to be concealed by a request for annual leave. If the reason for annual leave is of such a nature as to require FBIHQ action, such as death in the employee's close family, Form FD 208 should be submitted.

If the employee is temporarily assigned elsewhere, e.g., on an inspection assignment, the official to whom the employee is then assigned should notify FBIHQ in addition to notifying the employee's office of assignment.

Exhibit 9

UN DATE 01/12/2006                    LEAVE ACCOUNTING LIST AS OF PAY PERIOD     FROM 01/09/2005 TO 00/00/0000             PAGE     2

SSN: ~~XXXXXXXXX~~     FOR RAGSDALE SANDRA

| PP YEAR | CURR RATE | NEXT CHANGE | BEGIN YEAR | BEGIN PP | EARN PP | USE PP | END PP | OTHER USED PP | LWOP USED PP | RESTORED ACCT BAL | MIL FY BAL | LWOP CB | ADJUSTING PP/REASON |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15 2005 | | AL | | 16.00 | 8 | 16.00 | 8.00 | | AL 8.00 | | | | |
| | | SL | | -28.50 | 4 | | -24.50 | | | | | | |
| | | COMP | | | | | | | | | | | |
| 16 2005 | | AL | | 8.00 | 8 | 8.00 | 8.00 | | | | | | |
| | | SL | | -24.50 | 4 | | -20.50 | | | | | | |
| | | COMP | | | | | | | | | | | |
| 17 2005 | | AL | | 8.00 | 8 | 8.00 | 8.00 | | | | | | |
| | | SL | | -20.50 | 4 | | -16.50 | | | | | | |
| | | COMP | | | | | | | | | | | |
| 18 2005 | | AL | | 8.00 | | 16.00 | -8.00 | | SICK 24.00 | | | CB | |
| | | SL | | -16.50 | | | -16.50 | | | | | | |
| | | COMP | | | | | | | | | | | |
| 19 2005 | | AL | | -8.00 | 8 | | | | SICK 16.00 | | | | |
| | | SL | | -16.50 | 4 | | -12.50 | | | | | | |
| | | COMP | | | | | | | | | | | |
| 20 2005 | | AL | | | 8 | | 8.00 | | SICK 40.00 | | | | |
| | | SL | | -12.50 | 4 | | -8.50 | | | | | | |
| | | COMP | | | | | | | | | | | |
| 21 2005 | | AL | | 8.00 | | | 8.00 | | SICK 24.00 | | | CB | |
| | | SL | | -8.50 | | | -8.50 | | | | | | |
| | | COMP | | | | | | | | | | | |
| 22 2005 | | AL | | 8.00 | 8 | 16.00 | | | | | | | |
| | | SL | | -8.50 | 4 | | -4.50 | | | | | | |
| | | COMP | | | | | | | | | | | |
| 23 2005 | | AL | | | 8 | 8.00 | | | SICK 8.00 | | | | |
| | | SL | | -4.50 | 4 | | -0.50 | | | | | | |
| | | COMP | | | | | | | | | | | |
| 24 2005 | | AL | | | 8 | 8.00 | | | SICK 20.50 | | | | |
| | | SL | | -0.50 | 4 | | 3.50 | | | | | | |
| | | COMP | | | | | | | | | | | |
| 25 2005 | | AL | | | 8 | 8.00 | | | SICK 28.00 | | | | |
| | | SL | | | 4 | 4.00 | | | | | | | |
| | | COMP | | | | | | | | | | | |
| 26 2005 | | AL | | | | | | | SICK 32.00 | | | CB | |
| | | SL | | | | 8.00 | -8.00 | | | | | | |
| | | COMP | | | | | | | | | | | |
| 27 2005 | | AL | | | 8 | 8.00 | | | SICK 24.00 | | | | |
| | | SL | | -8.00 | 4 | | -4.00 | | | | | | |
| | | COMP | | | | | | | | | | | |

RUN DATE 01/12/2006          LEAVE ACCOUNTING LIST AS OF PAY PERIOD    FROM 01/09/2005 TO 00/00/0000        PAGE    3

SSN: 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    FOR RAGSDALE SANDRA

| PP YEAR | CURR RATE | NEXT CHANGE | BEGIN YEAR | BEGIN PP | EARN PP | USE PP | END PP | OTHER USED PP | LWOP USED PP | RESTORED ACCT BAL | MIL FY BAL | LWOP CB | ADJUSTING PP/REASON |
|---------|-----------|-------------|------------|----------|---------|--------|--------|----------------|---------------|--------------------|-----------|---------|---------------------|
| 28 2005 |           | AL          |            |          | 8       | 8.00   |        |                | SICK 24.00    |                    |           |         |                     |
|         |           | SL          |            | -4.00    | 4       |        |        |                |               |                    |           |         |                     |
|         |           | COMP        |            |          |         |        |        |                |               |                    |           |         |                     |

Exhibit 10

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                                    **Date:** 03/15/2005

**To:** CPAU Staff

**From:** Wyelene Haase, Acting Unit Chief
        Clearance Passage and Access Unit (CPAU)

**Approved By:** Haase Wyelene C

**Drafted By:** Ramsburg Michael T:mtr

**Case ID #:** 66F-HQ-A1362123 SUB C

**Title:** Leave Policy Reminders

**Synopsis:** The leave policies in place for the CPAU are described as outlined in this communication.

**Details:** This reminder is being issued to ensure that the CPAU staff is clear about the responsibilities and expectations concerning leave.

**Lunch Periods:**

     Lunch should normally be scheduled between the hours of 11:30 am and 2:00 pm, with no lunch period to last beyond 2:00 pm. Lunch periods are also not to be taken at the beginning or end of an employee's work shift. This will ensure our conformance with both the FBI Leave Policy Manual and the MAOP Part 2, 1-2.4.2 requirement that the unit be staffed during the "Core times", which is between the hours of 9:15 am -10:00 am, and 2:00 pm - 2:45 pm.

     FBI policy established that non-investigative employees may take a 10-minute break during each 4 hour work period. Break periods are not to be taken at the beginning or at the end of a workday. Break periods should be taken at mid-morning and at mid-afternoon. You are required to adhere to an established lunch and break schedule. Furthermore, you are expected to be at your assigned duty station performing your assigned duties at all times during your scheduled work shift, except during authorized lunch and break periods.

To:  CPAU Staff   From:  Wyelene Haase, Acting Unit Chief
Re:  66F-HQ-A1362123 SUB C, 03/15/2005

**Administrative Leave:**

        As you know, administrative leave, or excused absence,
is only authorized in certain, limited circumstances.  It is
commonly granted in situations including, but not limited to,
inclement weather conditions.  The Bureau has also authorized
administrative leave up to 2 hours (for FBIHQ employees) for
blood donations for the purpose of traveling to the donation
site, completing the donation and recovery from the donation
process.  If you are taking the 2 hours administrative leave
based on having donated blood, you must seek advanced permission
from your supervisor for the use of the administrative leave
prior to departing the workplace.  Additionally, the use of the
administrative leave should be noted on the time and attendance
register; leave must be used on the same day as the actual blood
donation; and since the purpose for the leave is to recuperate
from the donation process, please be reminded that administrative
leave for this purpose may not necessarily be granted for use at
the end of the work day.


**Routine requests for leave:**

        Requests for leave (Sick Leave (SL), Annual Leave (AL)
and Leave Without Pay (LWOP) etc.,) must be submitted at least 24
hours in advance, except in the case of a bonafide emergency.
LWOP requests will be approved by the Unit Chief.

**Annual Leave:**

        AL will generally be approved insofar as it is <u>accrued
and available for use; scheduled in advance; and if you can be
spared from work.</u>  This includes receiving prior approval before
making personal travel/vacation arrangements.  If you do not have
sufficient accrued AL available for the periods of leave
requested, advanced AL or LWOP may be authorized in rare
instances.  <u>I expect that you will carefully monitor your
personal AL accruals and use of AL to ensure it is available for
you to use when requested.</u>  Any requests for advanced AL will be
approved by the Section Chief.

**Sick Leave:**

        SL will generally be approved insofar as it is <u>accrued
and available for use.</u>  If you do not have sufficient accrued SL,
LWOP may be approved in rare instances.  Any advanced SL must be
approved by the Deputy Assistant Director (DAD).  <u>I expect that</u>

To: CPAU Staff  From: Wyelene Haase, Acting Unit Chief
Re: 66F-HQ-A1362123 SUB C, 03/15/2005

<u>you will carefully monitor your personal SL accruals and use of
SL to ensure it is available for you to use when requested</u>.

When an employee is absent for more than three days due
to illness, regardless of the type of leave charged, a doctor's
certification or other administratively acceptable evidence may
be required.  Administratively acceptable medical documentation
is a statement signed by your health care provider certifying
that the employee was incapacitated for work.  A stamped
signature is not acceptable.  The statement should be dated,
provide the inclusive dates of the incapacitation period and the
nature of incapacitation.

**I encourage you to accumulate both annual and sick leave balances
so it is available to you in the event of an emergency or other
unforseen circumstance.**

**Call-in procedures:**

If you are unable to report to work (and leave has not
previously been scheduled and approved) you should call in to
your immediate supervisor within 10 minutes of the start of your
work day, or as soon as practicable in the event of an emergency.
You may leave a voice mail message if you are unable to reach
your supervisor, however you must later call and discuss the
situation personally.  <u>The fact that you leave a message does not
guarantee approval</u>.  The leave request is not approved until you
personally speak with and receive approval from your supervisor.
The following telephone numbers are provided for your
convenience:  Winnie Huger 202-324-6878; Michael Ramsburg 202-
324-3604; Patricia Scherger 202-324-3270 or Wyelene Haase 202-
324-4736.

Any periods of unauthorized absence will be charged as
Absence Without Leave (AWOL).  AWOL may be grounds for
disciplinary action, up to and including removal from the Bureau.

**Training:**

I fully support employee training and professional
development.  To that end, if you are scheduled to attend
training, whether in-service or GETA, and the duration of the
course conflicts with, or goes beyond the end of your regular
tour of duty, I expect that you will adjust your work hours
rather than leave before the end of the training session.

Consideration will of course be given to unusual
circumstances, such as car/vanpool arrangements, childcare, etc.
These issues however, should be worked out in advance of your

To:  CPAU Staff   From:  Wyelene Haase, Acting Unit Chief
Re:  66F-HQ-A1362123 SUB C, 03/15/2005

attending the training with the approval of your supervisor.  The
Bureau expends financial resources on individual training and
these monies are often limited; therefore, we have an obligation
to ensure each employee derives the maximum benefit from
training.  Approval for requested training courses must be
obtained prior to scheduling training.  Failure to comply with
this requirement may result in non-reimbursement of expenses.

        Any questions regarding the above can be directed to
Acting Unit Chief Wyelene C. Haase at extension 4736.


♦♦

4

Exhibit 12

 **U.S. Office of Personnel Management**

# Leave Without Pay

Leave without pay (LWOP) is a temporary nonpay status and absence from duty that, in most cases, is granted at the employee's request. In most instances, granting LWOP is a matter of supervisory discretion and may be limited by agency internal policy. Employees, however, have an entitlement to LWOP in the following situations:

- The Family and Medical Leave Act of 1993 (FMLA) (Public Law 103-3, February 5, 1993), provides covered employees with an entitlement to a total of up to 12 weeks of unpaid leave (LWOP) during any 12-month period for certain family and medical needs. (See 5 CFR part 630, subpart L.)

- The Uniformed Services Employment and Reemployment Rights Act of 1994 (Pub.L. 103-353) provides employees with an entitlement to LWOP when employment with an employer is interrupted by a period of service in the uniformed service. (See 5 CFR 353.106.)

- Executive Order 5396, July 17, 1930, provides that disabled veterans are entitled to LWOP for necessary medical treatment.

- Employees may not be in a pay status while receiving workers' compensation payments from the Department of Labor.

Employees should be aware that LWOP affects their entitlement to or eligibility for certain Federal benefits. See Effect of Extended Leave without Pay (or other Nonpay Status) on Federal Benefits and Programs.

- To Leave Administration Home Page
- To OPM Home Page
- To Website Index

This page can be found on the web at the following url:
http://www.opm.gov/oca/leave/html/ANNUAL.asp

## U.S. Office of Personnel Management
**Ensuring the Federal Government has an effective civilian workforce**

### Annual Leave

An employee may use annual leave for vacations, rest and relaxation, and personal business or emergencies. An employee has a right to take annual leave, subject to the right of the supervisor to schedule the time at which annual leave may be taken. An employee will receive a lump-sum payment for accumulated and accrued annual leave when he or she separates from Federal service or enters on active duty in the armed forces and elects to receive a lump-sum payment.

**Accrual Rates**
**Accrual Rates for SES, SL/ST, or Equivalent Pay Systems**
**Creditable Service for Leave Accrual**
**Advance Annual Leave**
**Annual Leave Ceilings**
**Restoration of Annual Leave**
**Lump-sum Payments**
**Annual Leave to Establish Retirement Eligibility**
**References**

---

## Accrual Rates

| Employee Type | *Less than 3 years of service** | *3 years but less than 15 years of service** | *15 or more years of service** |
|---|---|---|---|
| Full-time employees | ½ day (4 hours) for each pay period | 3/4 day (6 hours) for each pay period, except 1¼ day (10 hours) in last pay period | 1 day (8 hours) for each pay period |
| Part-time employees** | 1 hour of annual leave for each 20 hours in a pay status | 1 hour of annual leave for each 13 hours in a pay status | 1 hour of annual leave for each 10 hours in a pay status |
| Uncommon tours of duty** | (4 hours) **times** (average # of hours per biweekly pay period) **divided by** 80 = biweekly accrual rate.*** | (6 hours) **times** (average # of hours per biweekly pay period) **divided by** 80 = biweekly accrual rate.*** | (8 hours) times (average # of hours per biweekly pay **period) divided by** 80 = biweekly accrual rate. *** |

* See Creditable Service for Leave Accrual

** Leave is prorated for part-time employees and employees on uncommon tours of duty.

*** In computing leave accrual for uncommon tours of duty, the accrual rate for the last full pay period

in a calendar year must be adjusted to ensure the correct amount of leave is accrued.

---

## Creditable Service for Leave Accrual

### Civilian Service

All civilian service that is *potentially* creditable for Civil Service Retirement Service (CSRS) purposes, including service covered by the Federal Employee Retirement Service (FERS) is also creditable for annual leave accrual. Potentially creditable service includes service that *could* be credited if the employee made deposits to the retirement fund. Such deposits are *not required* before the employee gets credit for annual leave accrual purposes. (See OPM's Guide to Processing Personnel Actions, Chapter 6

- Creditable Service for Leave Accrual Help.)

### Uniformed Service

- For non-retired members, full credit for uniformed service (including active duty and active duty for training) performed under honorable conditions is given for annual leave accrual purposes.
- For retirees, annual leave accrual credit is given only for:

  Actual service during a war declared by Congress (includes World War II covering the period December 7, 1941, to April 28, 1952) or while participating in a campaign or expedition for which a campaign badge is authorized.
  (See Vets Guide -- War Service Creditable for Veterans Preference.)

  **or**

  All active duty when retirement was based on a disability received as a direct result of armed conflict or caused by an instrumentality of war and incurred in the line of duty during a period of war as defined in 38 U.S.C. 101(11). "Period of war" includes World War II, the Korean conflict, Vietnam era, the Persian Gulf War, or the period beginning on the date of any future declaration of war by the Congress and ending on the date prescribed by Presidential proclamation or concurrent resolution of the Congress.

### Non-Federal Service or Uniformed Service

A newly appointed or reappointed employee may receive service credit for prior non-Federal service or active duty uniformed service that otherwise would not be creditable for the purpose of determining his or her annual leave accrual under the conditions prescribed in 5 CFR 630.205. See CPM 2005-07.

---

## Advance Annual Leave

Supervisors may grant advance annual leave consistent with agency policy. The amount of annual leave that may be advanced is limited to the amount of annual leave an employee would accrue in the remainder of the leave year. Employees do not have an entitlement to advance annual leave. In most cases, when an employee who is indebted for advance annual leave separates from Federal service, he or she is required to refund the amount of advance leave for which he or she is indebted.

## Annual Leave Ceilings

| Maximum Annual Leave That May Be Carried Over into the New Leave Year | |
|---|---|
| Federal Employees Stationed within the United States | 30 days |
| Federal Employees Stationed Overseas | 45 days |
| Members of the Senior Executive Service | 90 days |

Any accrued annual leave in excess of the maximum allowed by law will be forfeited. Forfeited annual leave may be restored under 5 U.S.C. 6304(d). (See Restoration of Annual Leave.)

## Annual Leave to Establish Retirement Eligibility

An employee may use annual leave to establish initial eligibility for retirement in reduction-in-force and other restructuring situations. An employee who has received a specific notice of termination in a RIF situation may use annual leave past the date the employee would otherwise have been separated in order to establish initial eligibility for immediate retirement, including discontinued service or voluntary early retirement.

## References

5 U.S.C. chapter 63, subchapter I
5 CFR 351.606
5 CFR part 630, subparts B and C
Comptroller General opinions:
16 Comp. Gen. 481 (1936), 39 Comp. Gen. 611 (1960) --absolute right
    B-189085 (04/03/78), 57 Comp. Gen. 325 (1978),
        58 Comp Gen. 684 (1979)--forfeiture
    B-213380 (08/20/84), B-256975 (10/11/94)--restoration
    B-188993 (12/12/77), 56 Comp. Gen. 470 (1977), 60 Comp. Gen. 598
        (1981), B-221265 (06/02/86)--general information.

- To Leave Administration Main Page

**U.S. Office of Personnel Management** 1900 E Street NW, Washington, DC 20415 | (202) 606-1800 | TTY (202) 606-2532

Exhibit 13

(Rev. 08-28-2000)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                                   **Date:** 12/27/2004

**To:** All Divisions                **Attn:** AD
                                            ADIC
                                            SAC
                                            LEGAT

**From:** Director's Office
          OEEOA, Special Programs Unit, Room 7901
          **Contact:** Rodney Yelder, Ext. 2352

**Approved By:** Pistole John S
                 Venture Veronica

**Drafted By:** Goode E Kelly

**Case ID #:** 280D-HQ-1127798

**Title:** OFFICE OF EQUAL EMPLOYMENT OPPORTUNITY AFFAIRS (OEEOA):
           PROCEDURES TO FACILITATE THE PROVISION OF REASONABLE
           ACCOMMODATION

**Synopsis:** The purpose of this correspondence is to outline the
Bureau's Reasonable Accommodation procedures as required by
Executive Order 13164.

Details: Executive Order 13164 directs all federal agencies to
establish procedures to facilitate the provision of reasonable
accommodations to employees and job applicants with disabilities.
Pursuant to this Executive Order, and our continuing obligations
under the Rehabilitation Act of 1973, the Attorney General has
issued guidelines for use by all components in the Department.
Each component is required to establish procedures for
implementing these guidelines.  The Bureau's reasonable
accommodation process has been modified in direct response to the
aforementioned Executive Order and in accordance with the
Rehabilitation Act of 1973.  The Bureau has also utilized the
U.S. Department of Justice (DOJ) Manual and Procedures for
Providing Reasonable Accommodation as a model in the development
of these procedures.  This document supercedes all previous
written reasonable accommodation guidance drafted by the Bureau,
and serves as the Bureau's official procedures.

        The reasonable accommodation process is intended to
serve FBI applicants and Bureau employees, both Special Agent and
support personnel.

To:  All Divisions  From:  Director's Office
Re:  280D-HQ-1127798, 12/27/2004

## Provision of Reasonable Accommodations

The Federal Bureau of Investigation has an ongoing
obligation under the Rehabilitation Act of 1973, 29 U.S.C 794, to
ensure that employees with physical and mental disabilities are
given reasonable accommodations that will enable them to perform
their jobs.  Beyond the legal obligations, the agency has a
strong institutional interest in providing accommodations that
will allow employees with disabilities to continue to contribute
at the highest levels to the mission of this agency.  In order to
reaffirm the commitment to these principles and responsibilities,
the Bureau is joining in a government-wide effort to improve
agency responses to requests for reasonable accommodations.  The
following guidelines describe the Bureau's policies and general
procedures for processing reasonable accommodation requests.

The process for providing reasonable accommodations
requires the cooperation of employees, supervisors, and, where
appropriate, Disability Program Coordinators to achieve a common
goal:  to ensure that employees are given the accommodations
necessary to enable them to perform their duties.

## Introduction and Overview

The Federal Bureau of Investigation has a legal
obligation to provide reasonable job accommodations for employees
and job applications with disabilities.  This policy statement
provides examples of the types of accommodations that are
appropriate and generally will be provided to Bureau employees
and applications with disabilities.  It also describes basic
procedures for processing requests for accommodations.  The
examples of accommodations identified in these Guidelines are not
exhaustive; instead, they illustrate the broad spectrum of
appropriate accommodations that generally will be provided at no
cost to the employee or applicant.  All of the identified
accommodations are appropriate for virtually all employees, both
Special Agent and professional support, and regardless of grade
level or experience.

The purpose of reasonable accommodations is to provide
employment opportunities for persons with disabilities who
otherwise would not be able to perform the essential functions of
their job, and to allow employees with disabilities to perform or
be more productive.  Reasonable accommodations may include, but
are not limited to (a) making existing facilities readily

2

To:  All Divisions  From:  Director's Office
Re:  280D-HQ-1127798, 12/27/2004

accessible to individuals with disabilities; (b) job restructuring, modification of work schedules or place of work, extended leave, reassignment to a vacant position; and (c) acquisition or modification of equipment or devices, including computer software and hardware, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers and/or interpreters and other similar accommodations.

Accommodation decisions should be based primarily on whether they will help the applicant or employee become a successful and productive member of the Bureau's workforce. Even though most job accommodations cost little or nothing, the Bureau will also satisfy more costly accommodation needs, such as providing readers, sign language interpreters, or personal assistants for travel to employees needing those services in order to perform their jobs. The cost should be evaluated in terms of the overall available financial resources of the Bureau.

<u>Reasonable Accommodation Requests and The Interactive Process</u>

In most circumstances, it is the obligation of the employee to request the reasonable accommodation. However, there may be situations where the known disability of the employee impairs that employee's ability to effectively communicate a need for an accommodation that is obvious to the supervisor. In either circumstance, the need for an accommodation should begin an interactive and flexible process between the employee and supervisor in order to identify an effective accommodation. An effective accommodation is one that will allow the employee to perform the essential functions of the job. The interactive process may include:

(1) an analysis of the particular job to determine its purpose and essential functions,

(2) a consultation with the employee to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation,

(3) an identification of potential accommodations and, in conjunction with the employee, an assessment of the effectiveness of those accommodations in

enabling the employee to perform the essential functions of the job,

(4) consideration of the preference of the employee

3

To:  All Divisions  From:  Director's Office
Re:  280D-HQ-1127798, 12/27/2004

and selection and implementation of the
accommodation that is appropriate for the employee
and the employer, and

(5)  the overall needs of the office.  The
accommodation need not be the most expensive, nor
must it be exactly what the employee requests, but
it must be effective.

## The Request Process

Job applicants may make requests for reasonable
accommodation to the individual identified in the appropriate
vacancy announcement as the point of contact for reasonable
accommodations, any designated accommodation official, or the
selecting official.  All vacancy announcements should identify an
individual as a contact for reasonable accommodation requests.
Vacancy announcements are found at www.fbi.gov.

Employees, under most circumstances, should submit a
written request to the first-line supervisor.  Employees may use
an FD-856, which is included in Attachment A and is available on
the OEEOA's intranet site.  If an employee initially makes the
request orally, it should be followed with a written request,
although the supervisor should begin processing the request upon
receipt of an oral request.  A family member, health
professional, or other representative who is acting on the
individual's behalf with the individual's consent also may make a
request for accommodation.

A supervisor may request medical documentation only
when the employee's need for accommodation is not apparent and
there is no other medical information already on record for the
employee which demonstrates that need.  If a supervisor does not
have authority to approve the request or chooses not to grant the
request, the request must be forwarded promptly to the Person's
with Disabilities Program Manager in the OEEOA for review by the
Reasonable Accommodation Committee (RAC).  If a supervisor fails
to respond to a request for accommodation within seven (7)
business days, an employee should contact a second line
supervisor or the Disability Program Manager in the OEEOA.  If an
employee has concerns about disclosing his or her disability to a
supervisor, the employee may send the request in the first
instance directly to a decision maker other than the direct
supervisor, such as a second line supervisor or the OEEOA.
Employees should understand, however, that it might become

4

To: All Divisions  From: Director's Office
Re: 280D-HQ-1127798, 12/27/2004

necessary to disclose that information to the supervisor in order
to facilitate the provision of the reasonable accommodation.

### Disposition of an Accommodation Request

The final disposition of all accommodation requests
must be documented in writing and forwarded to the Disabilities
Program Manager in the OEEOA. If a request is granted, the
approved accommodation must be recorded in the records maintained
by the Disabilities Program Manager. If a request for reasonable
accommodation is denied, the denial must be in writing and
outline the reason for the denial by using an EC format. The
official denying the request also must inform the employee of the
right to file an EEO complaint, or, if there is an adverse action
and if the individual is a preference eligible veteran, an appeal
with the Merit System Protection Board. Finally, the decision
maker should identify any available informal dispute resolution
avenues.

### Coordination of Reasonable Accommodation

Under DOJ's policy, "each component should designate an
adequate number of Accommodation Coordinators to facilitate the
procurement of equipment, furniture and services requested by
employees with disabilities." The Disabilities Program Manager
serves as the FBI's Accommodation Coordinator. The OEEOA will
maintain primary oversight of the reasonable accommodation
process and will use the Reasonable Accommodation Committee (RAC)
to facilitate appropriate disposition of these requests. The RAC
will be supported by and comprised of representatives from the
Office of the General Counsel (OGC), Health Care Programs Unit
(HCPU), and Administrative Services Division (ASD).
Representatives from these offices provide legal opinions,
evaluate medical documentation, and provide guidance on personnel
related matters. The OEEOA will also enlist the assistance of
the Facilities Management Unit (FMU) and other offices to provide
technical assistance in reasonable accommodation matters, as
necessary. The top 15 field offices will utilize the Disability
Coordinators in those offices to facilitate the reasonable
accommodation process. Other divisions may also designate
Disability Coordinators to facilitate the reasonable
accommodation process.

To:  All Divisions  From:  Director's Office
Re:  280D-HQ-1127798, 12/27/2004

## Medical Documentation and Confidentiality

The Bureau is entitled to know when an employee or applicant has a disability that requires a reasonable accommodation.  In some cases, the disability and need for accommodation will be obvious or otherwise already known to the decision maker.  In these cases, the Bureau will not seek any further medical information.  However, when a disability and/or need for reasonable accommodation is not obvious or otherwise already known to the decision maker, the component may require that the individual provide reasonable documentation about the disability and functional limitations.  The agency has a right to request supplemental medical information if the information submitted does not clearly explain the nature of the disability or the need for the reasonable accommodation, or does not otherwise clarify how the requested accommodation will assist the employee to perform the essential functions of the job.  Such a request for supplemental documentation must be specific so that the employee will know what to provide.  **It is not appropriate to request medical information that is unrelated to the individual's request for accommodation.**  For example, an individual may request an ergonomic keyboard because of carpal tunnel syndrome.  Although a supervisor may obtain medical information about the carpal tunnel syndrome, and the need for the keyboard, the supervisor may not request other, unrelated, medical information.  The agency also has the right to have medical information reviewed by a medical expert of the agency's choosing at the agency's request and at the agency's expense.

All requests for accommodations, along with any medical or other documentation provided, will be kept in files separate from the employee's personnel file.  The OEEOA will maintain the files after the decision maker makes a final determination on the request.  Access to this information is strictly limited to those employees with an identifiable need to review the information.

The failure to provide appropriate documentation or to cooperate with the Bureau's efforts to obtain such documentation may result in denial of the accommodation request.

## Timelines

Agency officials who receive requests for accommodation should respond to them promptly.  Officials should not delay in requesting medical documentation or in discussing the requested accommodation, including possible alternative accommodations,

To: All Divisions  From: Director's Office
Re: 280D-HQ-1127798, 12/27/2004

with the employee. **A final disposition ordinarily should be made within seven (7) business days of the request or receipt of medical documentation, in cases where medical documentation is required.** Once an accommodation has been approved or denied by the RAC, supervisors should act expeditiously to provide the recommended accommodations, if appropriate. Whenever possible, the request should be fulfilled within 15 business days of response by the RAC. These timelines are firm absent extenuating circumstances. Any delays in processing a reasonable accommodation request should be documented in the records maintained by the OEEOA.

### EXAMPLES OF ACCOMMODATIONS

The following provides guidance on the types of accommodations the Bureau should provide for certain disabilities where such accommodations would enable the individual to perform the essential functions of the job or participate in the benefits of the job. If an individual can no longer perform the essential functions of his/her current job, the Bureau must consider reassigning the individual to another position.

Accommodations for people who are deaf, hard of hearing, or who have other communication-related disabilities: The Bureau will accommodate employees and job applicants who are deaf, hard of hearing, or who have speech or motor impairments affecting communication by providing appropriate auxiliary aids and services and other accommodations to facilitate effective communications in all programs and services. Appropriate auxiliary aids may include, but are not limited to, telecommunication devices for deaf individuals ("TTYs"), sign language and oral interpreters, computer-assisted real-time transcription services, note takers (for training courses and meetings), captioned training tapes, and assistive listening devices and systems.

Accommodations for people who are blind or have visual impairments: The Bureau will accommodate employees and job applicants with visual impairments by providing readers and accessible computer equipment that is compatible with networks and other computer software. All Bureau publications and training materials will be made available in accessible formats such as large print, computer disk, or Braille.

Accommodations for people with mobility and manual impairments:

To: All Divisions   From: Director's Office
Re: 280D-HQ-1127798, 12/27/2004

For people with mobility impairments, the Bureau will provide
office equipment (i.e., raised desks) when requested to
facilitate the employee's ability to work efficiently and without
injury. Offices may be made accessible by adding ramps,
automatic door openers, accessible toilet stalls and clearing
hallways of obstructions. For manual impairments, examples of
accommodations might include, but are not limited to, the use of
personal assistants for travel, voice recognition systems, and
alternative keypad and keyboard access.

<u>Accommodations for people with mental or psychiatric illnesses or
disabilities affecting stamina</u>: Alternatives to the traditional
structured work environment allow many people with disabilities
such as cancer, HIV, and mental or psychiatric illness such as
major depression or panic attack disorders, to work full-time
without compromising the quality and quantity of their work for
the Bureau, their health, or their ability to schedule frequent
medical treatment, if necessary. Where an employee provides
adequate medical documentation of need, Bureau supervisors should
consider flexible work schedules, and extended leave as possible
reasonable accommodations. The Bureau will also accommodate
employees with learning disabilities. Supervisors may consider
the impact of the accommodation upon the operation of their
office, including the impact on the ability of other employees to
perform their duties and the impact on the component's ability to
conduct business.

<u>Service Animals</u>: A service animal means any guide dog, signal
dog, or other animal trained to provide assistance to persons
with disabilities including, but not limited to, guiding persons
who have visual or hearing impairments. A service animal also
may be an animal trained to pull a wheelchair. The Department
permits the use of service animals, which may accompany employees
throughout the Department and to all Department activities.

### ACQUIRING THE ACCOMMODATIONS

The following guidance will assist supervisors in
handling requests for accommodations:

1. <u>Procuring equipment, furniture, and services</u>.
Approved requests for equipment, furniture or other services such
as interpreters for deaf employees should be put in writing and
forwarded to the Disability Program Manager or Disability
Coordinator. Often the employee requesting the accommodation is
knowledgeable about a specific product that is effective.

8

To: All Divisions  From: Director's Office
Re: 280D-HQ-1127798, 12/27/2004

Therefore, if known, a detailed description of the supplies, equipment, or services should be provided, including any specifications, preferences, or manufacturer literature.

Once approved, all procurement-related reasonable accommodation requests should be processed in accordance with federal procurement guidelines. Requests for reasonable accommodations should be tracked and made a top priority by the Disabilities Program Manager, and where appropriate, the Disabilities Coordinator, to ensure that accommodations will be provided expeditiously.

The Department has contracted with the Department of Defense to participate in its Computer/Electronic Accommodations Program (CAP). Thus, where an employee needs adaptive equipment for computer hardware and software, the Disabilities Program Manager or Disabilities Coordinator should contact the Department of Defense for assistance. The Disabilities Program Manager in the OEEOA can provide additional information about the CAP Program.

2. On-going accommodations. Some employees may need an accommodation on an intermittent basis. For example, a deaf employee may need an interpreter for attendance at meetings or training sessions. Each request is not a new request for accommodation, and does not require a formal, written request or a formal written response. Supervisors should notify the Disabilities Program Manager who will work the Division to ensure that such accommodations will be made available on an as-needed basis.

When there is a change in the supervisor or manager of an employee who is receiving a reasonable accommodation, the new supervisor or manager should be notified of the ongoing accommodation and his or her responsibilities for ensuring that the accommodation continues in accordance with these procedures. If there is a change in the supervisor or manager of an employee who is receiving an accommodation, the Division must notify the Disabilities Program Manager who will coordinate with the new supervisor or manager to provide necessary information and guidance.

3. Accommodations outside the usual place of work. Official off-site events, such as retreats, training sessions, official office parties, and similar functions, should be located in places that are accessible to employees. The Bureau has an

9

To:  All Divisions  From:  Director's Office
Re:  280D-HQ-1127798, 12/27/2004

obligation to ensure that programs, such as training programs
sponsored through non-DOJ entities, whether at other agencies or
through a private sector entity, are fully accessible and provide
the accommodations necessary to facilitate the participation of
employees with disabilities.  Where a non-DOJ program does not
provide a necessary accommodation, it remains the responsibility
of the Department to provide that accommodation.

     4. _Job restructuring and work schedules_. Requests for
modified work schedules, telecommuting and job restructuring--
that is, modifying the scope of a job--involve individualized
assessments that take into account the needs of the employee and
the needs of the office.  The Department should consider
providing flexible work schedules as a reasonable accommodation
to employees with disabilities where the employee establishes the
need for such a schedule.  Supervisors should discuss various
options with the employee to devise a reasonable work schedule.

     It also may be necessary to redefine the job duties as
a reasonable accommodation.  An employee must be able to perform
the essential functions of the job, but where it is possible to
remove certain non-essential tasks from an employee's work
requirements, this should be done.

     5. _Reassignment to a vacant position_. Under the
Rehabilitation Act, reassignment to a vacant position can be an
appropriate and reasonable accommodation.  The Bureau is not
required to create jobs for individuals.  Reassignment will only
be considered if no other reasonable accommodation is available.
When it appears that reassignment is appropriate, the supervisors
and the Reasonable Accommodation Committee should attempt to
identify jobs to which an individual can be reassigned or
detailed.  The Bureau will first focus on positions which are
equivalent to the employee's current job in terms of pay, status,
and other relevant factors.  If there is no vacant equivalent
position, the Bureau may consider vacant lower level positions
for which the individual is qualified.  Reassignment may be made
to a vacant position outside of the employee's commuting area if
the employee is willing to relocate.  As with other transfers not
required by management, the Bureau will not pay for the
employee's relocation costs.

     6. _Job Applicants_. Reasonable accommodations for job
applicants may include providing an accessible location for job
interviews; sign language interpreters; providing other assistive
devices; and other accommodations that may be needed in the

10

To:  All Divisions   From:  Director's Office
Re:  280D-HQ-1127798, 12/27/2004


application process.

      7. <u>Retaliation</u>. A supervisor may not retaliate against
an employee who has requested an accommodation.


## **APPEALS**

      The Reasonable Accommodation process is intended to be
interactive and ongoing.  An employee may request a re-evaluation
and/or assessment for an additional accommodation by submitting
updated medical documentation.  Although the OEEOA does not
guarantee that additional accommodations will be provided, all
requests will be given full consideration under applicable laws.

      If an employee or applicant remains dissatisfied
following re-evaluation of an accommodation matter, that
individual may contact an EEO Counselor within 45 calendar days
of the date of denial of an accommodation.

      An employee may also choose to engage in the Bureau's
Alternative Disputes Resolution (ADR) Program.  The Bureau's ADR
program is managed by the OEEOA.  Additional information about
the Bureau's ADR Program is available on the OEEOA's intranet
site and from the ADR Program Manager in the OEEOA.


## **RECORD KEEPING**

      All information submitted or provided by an employee or
applicant as part of their request for an accommodation will be
kept confidential.  All accommodation request files shall be
forwarded to the OEEOA and assigned a 280E file number and
maintained by the OEEOA.  Copies of reasonable accommodation
requests will not be recorded in the requestor's personnel file.

      This information may be used, in part, to track and/or
identify related trends, and as statistical data submitted as
part of annual EEO reports required by the EEOC.  Further, the
U.S. Department of Justice may request this data for its
divisions and components, and forward the information to the
EEOC.

11

To: All Divisions  From: Director's Office
Re: 280D-HQ-1127798, 12/27/2004

## SIGN LANGUAGE INTERPRETING SERVICES

The function of an interpreter is to facilitate communication between hearing persons and persons who are deaf or hard of hearing through interpretation of American Sign Language or through the transliteration of signed English to spoken English.

The FBI's senior staff sign language interpreter is located in the OEEOA, Special Programs Unit, at FBIHQ. Requests for sign language interpreting services, Bureau-wide, are processed through the OEEOA.

### 1. Scheduling an Interpreter

Requests for interpreting services should be made in writing, preferably using an FD-820 (Sign Language Interpreter Request Form), and should include the requesting unit/office; requestor's name; date of request; and requestor's telephone number. In addition, the requesting office/unit must provide the following information:

1.    Date and description of the event, meeting, etc;
2.    Time of event; including estimated start and end times;
3.    Location of event; including address and telephone number;
4.    Name(s) of deaf person(s) who will be attending;
5.    Language preference of deaf person(s) (If known);
6.    On-site point of contact and telephone number; any additional information if necessary (security clearance, etc.)

All requests should be forwarded to FBIHQ, OEEOA, Room 7901. They should be submitted within 10 business days prior to the activity/event; 15 business days prior to 1-2 day activities/events, and 30 days prior to events scheduled for longer than two weeks. These requests should be sent to the attention of the sign language interpreter. Requests may also be faxed (202-324-3976).

***The OEEOA cannot guarantee sign language interpreting services for untimely requests.

### 2. Canceling Services

If an event/activity is canceled, it is imperative that

12

To:  All Divisions  From:  Director's Office
Re:  280D-HQ-1127798, 12/27/2004

the OEEOA be contacted as soon as possible.

### 3.  Failure of Requestor to Appear

In the event that a requestor of interpreting services
fails to appear for an appointment, the interpreter will wait 20
minutes for a one-hour assignment, and 30 minutes for assignments
that are longer than an hour in duration.

### 4.  Medical Emergency Assigments

During emergency situations, the OEEOA and HCPU will
make every attempt to coordinate sign language interpreting
services for headquarters and field office employees who are deaf
or hard of hearing.


### REQUEST FOR ACCOMMODATIONS DURING TRAINING, MEETINGS, CONFERENCES, ETC.

The Office of OEEOA is responsible for ensuring that
employees with special needs are accommodated during Bureau
sponsored activities.  An employee who requires a sign language
interpreter or other accommodations during Bureau sponsored
activities should contact the Persons with Disabilities Program
Manager at 202-324-2352.  Requests should be made at least 15
business days prior to the first day of the activity.

Individuals who require accessible transportation
to/from local airports may contact the PDPM for assistance in
identifying appropriate transportation services.  Employees
utilizing these services should:  1) make their own reservations
directly through the service provider; 2) ensure that the
information is reflected as a travel expense on the travel order;
and 3) ascertain if a security clearance is necessary for the
service provider from the course coordinator.

13

To:  All Divisions  From:  Director's Office
Re:  280D-HQ-1127798, 12/27/2004


**LEAD(s):**

**Set Lead 1:**

　　ALL RECEIVING OFFICES

　　In compliance with Executive Order 13164, the OEEOA will
ensure that copies of this document are made available and
accessible to all employees and applicants.  Alternative formats
will also be made available upon request.
◆◆

14

*The U.S. Equal Employment Opportunity Commission*

| EEOC | NOTICE | Number 915.002 |
|------|--------|--------|
| | | October 17, 2002 |

1. SUBJECT: EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act

2. PURPOSE: This enforcement guidance supersedes the enforcement guidance issued by the Commission on 03/01/99. Most of the original guidance remains the same, but limited changes have been made as a result of: (1) the Supreme Court's decision in US Airways, Inc. v. Barnett, 535 U.S., 122 S. Ct. 1516 (2002), and (2) the Commission's issuance of new regulations under section 501 of the Rehabilitation Act. The major changes in response to the Barnett decision are found on pages 4-5, 44-45, and 61-62. In addition, minor changes were made to certain footnotes and the Instructions for Investigators as a result of the Barnett decision and the new section 501 regulations.

3. EFFECTIVE DATE: Upon receipt.

4. EXPIRATION DATE: As an exception to EEOC Order 205.001, Appendix B, Attachment 4, . a(5), this Notice will remain in effect until rescinded or superseded.

5. ORIGINATOR: ADA Division, Office of Legal Counsel.

6. INSTRUCTIONS: File after Section 902 of Volume II of the Compliance Manual.

# Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act

## Table of Contents

INTRODUCTION

GENERAL PRINCIPLES

REQUESTING REASONABLE ACCOMMODATION

REASONABLE ACCOMMODATION AND JOB APPLICANTS

REASONABLE ACCOMMODATION RELATED TO THE BENEFITS AND PRIVILEGES OF EMPLOYMENT

TYPES OF REASONABLE ACCOMMODATIONS RELATED TO JOB PERFORMANCE

JOB RESTRUCTURING

Case 1:07-cv-01236-RBW Document 1-4 Filed 10/26/2007 Page 2 of 48

LEAVE

MODIFIED OR PART-TIME SCHEDULE

MODIFIED WORKPLACE POLICIES

REASSIGNMENT

OTHER REASONABLE ACCOMMODATION ISSUES

UNDUE HARDSHIP ISSUES

BURDENS OF PROOF

INSTRUCTIONS FOR INVESTIGATORS

APPENDIX: RESOURCES FOR LOCATING REASONABLE ACCOMMODATIONS

INDEX

---

# Enforcement Guidance:
# Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act

## INTRODUCTION

This Enforcement Guidance clarifies the rights and responsibilities of employers and individuals with disabilities regarding reasonable accommodation and undue hardship. Title I of the ADA requires an employer to provide reasonable accommodation to qualified individuals with disabilities who are employees or applicants for employment, except when such accommodation would cause an undue hardship. This Guidance sets forth an employer's legal obligations regarding reasonable accommodation; however, employers may provide more than the law requires.

This Guidance examines what "reasonable accommodation" means and who is entitled to receive it. The Guidance addresses what constitutes a request for reasonable accommodation, the form and substance of the request, and an employer's ability to ask questions and seek documentation after a request has been made.

The Guidance discusses reasonable accommodations applicable to the hiring process and to the benefits and privileges of employment. The Guidance also covers different types of reasonable accommodations related to job performance, including job restructuring, leave, modified or part-time schedules, modified workplace policies, and reassignment. Questions concerning the relationship between the ADA and the Family and Medical Leave Act (FMLA) are examined as they affect leave and modified schedules. Reassignment issues addressed include who is entitled to reassignment and the

alternative formats. This fact, however, does not excuse either one from their respective obligations. If Super Trainers refuses to provide the braille version, despite its Title III obligations, XYZ still retains its obligation to provide it as a reasonable accommodation, absent undue hardship.

Employers arranging with an outside entity to provide training may wish to avoid such problems by specifying in the contract who has the responsibility to provide appropriate reasonable accommodations. Similarly, employers should ensure that any offsite training will be held in an accessible facility if they have an employee who, because of a disability, requires such an accommodation.

Example B: XYZ Corp. arranges for one of its employees to provide CPR training. This three-hour program is optional. A deaf employee wishes to take the training and requests a sign language interpreter. XYZ must provide the interpreter because the CPR training is a benefit that XYZ offers all employees, even though it is optional.

# TYPES OF REASONABLE ACCOMMODATIONS RELATED TO JOB PERFORMANCE[46]

Below are discussed certain types of reasonable accommodations related to job performance.

### Job Restructuring

Job restructuring includes modifications such as:

o reallocating or redistributing marginal job functions that an employee is unable to perform because of a disability; and

o altering when and/or how a function, essential or marginal, is performed.[47]

An employer never has to reallocate essential functions as a reasonable accommodation, but can do so if it wishes.

16. If, as a reasonable accommodation, an employer restructures an employee's job to eliminate some marginal functions, may the employer require the employee to take on other marginal functions that s/he can perform?

Yes. An employer may switch the marginal functions of two (or more) employees in order to restructure a job as a reasonable accommodation.

Example: A cleaning crew works in an office building. One member of the crew wears a prosthetic leg which enables him to walk very well, but climbing steps is painful and difficult. Although he can perform his essential functions without problems, he cannot perform the marginal function of sweeping the steps located throughout the building. The marginal functions of a second crew member include cleaning the small kitchen in the employee's lounge, which is something the first crew member can perform. The employer can switch the marginal functions performed by these two employees.

### Leave

Permitting the use of accrued paid leave, or unpaid leave, is a form of reasonable accommodation when necessitated by an employee's disability.[48] An employer does not have to provide paid leave beyond that which is provided to similarly-situated employees. Employers

should allow an employee with a disability to exhaust accrued paid leave first and then provide unpaid leave.[49] For example, if employees get 10 days of paid leave, and an employee with a disability needs 15 days of leave, the employer should allow the individual to use 10 days of paid leave and 5 days of unpaid leave.

An employee with a disability may need leave for a number of reasons related to the disability, including, but not limited to:

- o obtaining medical treatment (e.g., surgery, psychotherapy, substance abuse treatment, or dialysis); rehabilitation services; or physical or occupational therapy;

- o recuperating from an illness or an episodic manifestation of the disability;

- o obtaining repairs on a wheelchair, accessible van, or prosthetic device;

- o avoiding temporary adverse conditions in the work environment (for example, an air-conditioning breakdown causing unusually warm temperatures that could seriously harm an employee with multiple sclerosis);

- o training a service animal (e.g., a guide dog); or

- o receiving training in the use of braille or to learn sign language.

17. May an employer apply a "no-fault" leave policy, under which employees are automatically terminated after they have been on leave for a certain period of time, to an employee with a disability who needs leave beyond the set period?

No. If an employee with a disability needs additional unpaid leave as a reasonable accommodation, the employer must modify its "no-fault" leave policy to provide the employee with the additional leave, unless it can show that: (1) there is another effective accommodation that would enable the person to perform the essential functions of his/her position, or (2) granting additional leave would cause an undue hardship. Modifying workplace policies, including leave policies, is a form of reasonable accommodation.[50]

18. Does an employer have to hold open an employee's job as a reasonable accommodation?

Yes. An employee with a disability who is granted leave as a reasonable accommodation is entitled to return to his/her same position unless the employer demonstrates that holding open the position would impose an undue hardship.[51]

If an employer cannot hold a position open during the entire leave period without incurring undue hardship, the employer must consider whether it has a vacant, equivalent position for which the employee is qualified and to which the employee can be reassigned to continue his/her leave for a specific period of time and then, at the conclusion of the leave, can be returned to this new position.[52]

Example: An employee needs eight months of leave for treatment and recuperation related to a disability. The employer grants the request, but after four months the employer determines that it can no longer hold open the position for the remaining four months without incurring undue hardship. The employer must consider whether it has a vacant, equivalent position to which the employee can be reassigned for the remaining four months of leave, at the end of which time the employee would return to work in that new position. If an equivalent position is not available, the employer must look for a vacant position at a lower level. Continued leave is not required as a reasonable accommodation if a vacant position at a lower level is also unavailable.

19. Can an employer penalize an employee for work missed during leave taken as a reasonable accommodation?

47. 42 U.S.C. § 12111(9)(B) (1994); 29 C.F.R. pt. 1630 app. §§ 1630.2(o), 1630.9 (1997); see Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112-13, 4 AD Cas. (BNA) 1234, 1236-37 (8th Cir. 1995).

48. 29 C.F.R. pt. 1630 app. § 1630.2(o) (1997). See Cehrs v. Northeast Ohio Alzheimer's, 155 F.3d 775, 782, 8 AD Cas. (BNA) 825, 830-31 (6th Cir. 1998).

An employee who needs leave, or a part-time or modified schedule, as a reasonable accommodation also may be entitled to leave under the Family and Medical Leave Act. See Questions 21 and 23, infra.

49. See A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act, at 3.10(4), 8 FEP Manual (BNA) 405:6981, 7011 (1992) [hereinafter TAM].

50. 42 U.S.C. § 12111(9)(B) (1994); 29 C.F.R. § 1630.2(o)(2)(ii) (1997). See US Airways, Inc. v. Barnett, 535 U.S., 122 S. Ct. 1516, 1521 (2002). See also Question 24, infra. While undue hardship cannot be based solely on the existence of a no-fault leave policy, the employer may be able to show undue hardship based on an individualized assessment showing the disruption to the employer's operations if additional leave is granted beyond the period allowed by the policy. In determining whether undue hardship exists, the employer should consider how much additional leave is needed (e.g., two weeks, six months, one year?).

51. See Schmidt v. Safeway Inc., 864 F. Supp. 991, 996-97, 3 AD Cas. (BNA) 1141, 1145-46 (D. Or. 1994); Corbett v. National Products Co., 4 AD Cas. (BNA) 987, 990 (E.D. Pa. 1995).

52. See EEOC Enforcement Guidance: Workers' Compensation and the ADA at 16, 8 FEP Manual (BNA) 405:7391, 7399 (1996) [hereinafter Workers' Compensation and the ADA]. See also pp. 37-45, infra, for information on reassignment as a reasonable accommodation.

53. Cf. Kiel v. Select Artificials, 142 F.3d 1077, 1080, 8 AD Cas. (BNA) 43, 44 (8th Cir. 1998).

54. See Criado v. IBM, 145 F.3d 437, 444-45, 8 AD Cas. (BNA) 336, 341 (1st Cir. 1998).

55. But see Matthews v. Commonwealth Edison Co., 128 F.3d 1194, 1197-98, 7 AD Cas. (BNA) 1651, 1653-54 (7th Cir. 1997) (an employee who, because of a heart attack, missed several months of work and returned on a part-time basis until health permitted him to work full-time, could be terminated during a RIF based on his lower productivity). In reaching this decision, the Seventh Circuit failed to consider that the employee needed leave and a modified schedule as reasonable accommodations for his disability, and that the accommodations became meaningless when he was penalized for using them.

56. If an employee, however, qualifies for leave under the Family and Medical Leave Act, an employer may not require him/her to remain on the job with an adjustment in lieu of taking leave. See 29 C.F.R. § 825.702(d)(1) (1997).

57. See Question 9, supra.

58. For more detailed information on issues raised by the interplay between these statutes, refer to the FMLA/ADA Fact Sheet listed in the Appendix.

59. Employers should remember that many employees eligible for FMLA leave will not be entitled to leave as a reasonable accommodation under the ADA, either because they do not meet the ADA's definition of disability or, if they do have an ADA disability, the need for leave is unrelated to that disability.